**In re Suzanne GIERMAN, Debtor.**

**SHEARSON LEHMAN HUTTON MORTGAGE CORPORATION, Plaintiff,**

v.

**Suzanne GIERMAN, Defendant.**

Bankruptcy No. 88–6491–8P7.
Adv. No. 89–057.

United States Bankruptcy Court,
M.D. Florida,
Tampa Division.

Oct. 24, 1989.

Dennis R. Ferguson, Stagg, Hardy & Yerrid, Tampa, Fla., for plaintiff.

Daniel A. Medeiros, Sarasota, Fla., for defendant.

## ORDER GRANTING MOTION FOR INVOLUNTARY DISMISSAL

ALEXANDER L. PASKAY, Chief Judge.

THIS is a Chapter 7 case and the matter under consideration is the dischargeability vel non of a debt owing to Shearson Lehman Hutton Mortgage Corporation (Shearson Lehman) by Suzanne Gierman (Debtor). The Debtor's liability is based on a Final Default Judgment in the amount of $459,-685.51 entered by the District Court in Texas. The three-count Complaint seeks a determination that the amount of the Final Judgment should be declared to be nondischargeable based on Section 523(a)(2), Section 523(a)(4) and Section 523(a)(6) of the Bankruptcy Code.

In Count I, Shearson Lehman contends that the Debtor made fraudulent misrepresentations of material facts to the Plaintiff; that she obtained money from the Plaintiff in the form of a commission paid to her in connection with a fraudulent loan transaction. The claim in Count II is based upon

allegations that the Debtor breached certain fiduciary obligations owed to the Plaintiff and, as a result, the Plaintiff suffered damages for which the Debtor should be held liable. In Count III the Plaintiff alleges that the Debtor willfully and maliciously caused injury to the Plaintiff or its property through her participation in a conspiracy to defraud the Plaintiff.

At the conclusion of the presentation of the Plaintiff's case, counsel for the Debtor moved for an involuntary dismissal pursuant to Bankruptcy Rule 7041(b) claiming that the Plaintiff failed to establish with the requisite degree of proof a prima facie case upon which relief may be granted. The facts as established at the final evidentiary hearing by the Plaintiff, which are relevant to the disposition of this matter, are essentially as follows:

At the time relevant to this controversy, the Debtor was employed as a loan officer by Shearson Lehman, the Plaintiff who instituted this adversary proceeding. In her position, she was responsible for arranging mortgage loans which the Plaintiff typically sold in the secondary market. Her responsibilities included gathering documents and information regarding the property to be financed and the prospective borrower and forwarding that information to a loan processor within the Plaintiff's organization. The loan processor would then assemble and verify the information and documents and send them to a contract underwriter. The contract underwriter would make the final decision as to whether or not to fund the loan and would inform the loan processor of the decision. Then, the loan processor would authorize funding of the loan and send the appropriate documents and funds to a title insurance company for closing. In the broad scheme of things, the Debtor effectively acted as a salesperson whose job was to sell mortgage loans. She was paid on a commission basis and had no authority to make decisions as to whether or not to fund loan requests.

It appears that the Debtor became acquainted with Aaron Randall (Randall), a business associates of Charles McNeely (McNeely). Randall was a developer and builder and also owned a physical health facility, apparently with McNeely, which was operated under the name of Beverly Hills Workouts. Daniel Helgenberger (Helgenberger) met McNeely at the fitness center where Helgenberger worked out. McNeely and Randall offered Helgenberger a job to manage the Beverly Hills Workouts at a salary of $2,000 per month. Although he worked there for five months, he received only one month's pay. Helgenberger also operated a side business known as Midwest Strength and Fitness Consultants. This business was a one-man operation of Helgenberger selling vitamins and some fitness equipment and Helgenberger earned between $200 and $500 per month from this operation.

During the time relevant, Helgenberger lived in a home owned by McNeely. In late 1986, McNeely asked Helgenberger to assist Randall concerning a transaction involving the sale of a home owned by Randall located in Double Oak, Texas. McNeely and Randall persuaded Helgenberger to agree to act as a purported purchaser of the property owned by Randall at an inflated price. It was part of the scheme that Helgenberger would borrow from the Plaintiff the purchase price and Randall and McNeely would receive $50,000 in cash for the purported sale and refinancing. Helgenberger was promised that he will merely act as a straw man and after the financing of the transaction was complete he would re-convey the property to Randall and that the transaction would not harm his credit rating and it was promised that he would not suffer any adverse consequences as a result of his participation in this scheme. While Helgenberger initially protested that he could not qualify for financing, McNeely and Randall assured him that he does not have to worry about it because they would arrange the financing for this transaction.

Randall presented the appropriate real estate purchase contract and loan application documents to the Debtor on behalf of Helgenberger. Randall then brought the Debtor to Beverly Hills Workouts to interview Helgenberger regarding the prospec-

tive loan transaction. Helgenberger claims that all documents, including the loan application, was presented by Randall to the Debtor were signed by him in blank, and that Randall filled in all the information requested by the loan application. It appears that Randall grossly enhanced Helgenberger's financial condition. For instance, the loan application indicated his income to be $7,000.00 per month. Among the alleged assets of Helgenberger scheduled on the loan application was a certificate of deposit in the amount of $43,000. It appears that Randall transferred a certificate of deposit in the amount of $43,000.00 and placed same in an account opened in the name of Helgenberger without his knowledge to provide the appearance that Helgenberger was on sound financial footing and to show that Helgenberger possessed funds necessary to pay the down payment for the purchase of the home in Double Oak, Texas. The Contract for Sale and Purchase required a down payment of $19,000.00 on a purchase price of $190,000.00 and financing of the $171,000.00 balance.

The Debtor gathered the information received from Randall and forwarded it to the loan processor. Among the items forwarded to the loan processor were a false verification of Helgenberger's employment and phony salary information. Both of these items were prepared and signed by McNeely's girlfriend without Helgenberger's knowledge. McNeely and Randall instructed Helgenberger that he should not forward any information to the Debtor and that he should leave it to them to take care of any requests for information or documentation by the mortgage company. The appraisal submitted by Randall indicated that the value of the home equalled the purchase price of $190,000.00. In addition, a fraudulent satisfactory completion certificate was forwarded by the appraiser which showed that certain necessary improvements to the subject property had been completed when in fact they were not.

On December 11, 1986, the loan was closed and funds were disbursed. No payments were ever made on the note. On February 19, 1987, the Plaintiff sent a default letter to Helgenberger indicating that the loan was in default and that further action would be taken if the arrearages were not paid. A foreclosure ensued and the Plaintiff ultimately purchased the property and obtained a trustee's deed at the foreclosure on July 7, 1987. Eventually, the Plaintiff resold the property and suffered a loss which exceeded $100,000.00. The Plaintiff then sued the Debtor, Helgenberger, McNeely, Randall, the appraiser and the title insurance company in the District Court in Texas. On September 27, 1988, a Default Final Judgment was entered against the Debtor for actual damages of approximately $109,700.00 and punitive damages in the amount of $350,000.00. The Debtor then filed this Chapter 7 case and seeks to have the debt evidenced by the Final Judgment discharged.

These are the facts established by the Plaintiff in the prosecution of its case, which according to the Debtor, is legally insufficient to even make out a prima facie case and, accordingly, the Motion for Involuntary Dismissal should be granted.

It should be noted that the burden of proof is on the Plaintiff and the proof required is clear and convincing and not merely the preponderance of the evidence. *See In the Matter of Bonanza Import & Export, Inc.,* 43 B.R. 577 (Bkrtcy. S.D.Fla.1984); *In re Danns v. Household Finance Corp.,* 558 F.2d 1577 (11th Cir.1986); *In re Newman,* 13 B.R. 128, 130 (Bkrtcy. E.D.Wisc.1981). Applying this test to the claims asserted by the Plaintiff, it is clear that the Plaintiff has woefully failed to meet this test of the claims set forth in the three counts of the Complaint. Concerning the first count, it is clear that there is nothing in this record to show that the Debtor herself made any material misrepresentations. While it appears that she received a commission on this transaction, all the information in the loan package either came from Helgenberger or from Randall and not from her and there is nothing in the evidence to show that she knew that the information furnished was false when she forwarded the completed loan package to the loan pro-

cessor. Since this was the extent of her involvement in processing this particular loan, the claim set forth in Count I cannot be sustained based on the record.

■ The claim in Count II is based on Section 523(a)(4) and alleges a breach of a fiduciary duty. The only basis to establish the Debtor was a fiduciary is the employment contract described as "Loan Officer Agreement" entered into between the Plaintiff and the Defendant on October 13, 1986. (Plaintiff's Exh. No. 1). This contract in Paragraph 1.5 provides:

> 1.5 The Loan Officer will not at any time, in any fashion, form, or manner, either directly or indirectly, divulge, disclose, or communicate to any person, firm, or corporation in any manner whatsoever any information of any kind, nature, or description concerning any matters affecting or relating to the business of the Company, including, without limitation, the names of any of its customers, the amounts of fees, charges, or interest rates it obtains or has obtained, or any other information concerning the business of the Company, its manner of operation, or its plans, procedures, or other data of any kind, nature, or description without regard to whether any or all of the foregoing matters would be deemed confidential, material or important.

It is well established that the concept of fiduciary as it is used in the provisions dealing with exceptions to discharge under the Bankruptcy Code is a question of federal law. As noted by the Fifth Circuit Court of Appeal:

> In almost all of the commercial transactions of the country confidence is reposed in the punctuality and integrity of the debtor, and a violation of these is, in a commercial sense, a disregard of a trust. But this is not the relation spoken of in the Bankruptcy Act ... 'The act speaks of technical trusts, and not those which the law implies from the contract.'

*Chapman v. Forsyth*, 43 U.S. (2 How.) 202, 207, 11 L.Ed. 236, 238 (1844). This technical trust must exist prior to the act which created the debt without reference to that act. *See Upshur v. Briscoe*, 138 U.S. 365, 378, 11 S.Ct. 313, 317, 34 L.Ed. 931, 936 (1890). Using this standard, it is clear that the Defendant was not a fiduciary within the meaning of the term used in Section 523(a)(4) and that Count II should be dismissed.

■ This leaves for consideration the claim set forth in Count III, which is based on the allegation that the Defendant wilfully and maliciously injured property of another. At the outset it is difficult to perceive what property was injured, even assuming arguendo that such injury, in fact, occurred as a result of the act or conduct of this Debtor. Moreover, it is clear that under this exception the reckless disregard standard established by the Supreme Court in *Tinker v. Colwell*, 193 U.S. 473, 24 S.Ct. 505, 48 L.Ed. 754, 11 Am.Bankr.Rep. 568 (1904), has been overruled by this section and the Congress clearly intended to cover only deliberate and intentional wrongful acts which involves specific intent to injure. *Notes of Committee on the Judiciary House Report No. 95–595.* The Eleventh Circuit Court of Appeals in the case of *In re Ikner*, BNA's Bankruptcy Law Reporter, Volume 1, Number 12 (not yet generally reported) reaffirmed this proposition by holding that under this exception to the discharge there must be a more stringent standard than is generally applied in trials involving wantonness. The Court in *Ikner* concluded that under the Bankruptcy Code, the willfulness prong of the "willful and malicious injury" exception to dischargeability cannot be established by a mere showing of a reckless disregard of duty. According to Judge Tuttle, who wrote the opinion for the Court, this standard requires a showing of an intentional or deliberate act more than merely reckless disregard of rights of another. As to the malicious prong of the statute, the Court concluded that this term must include a conduct which is wrongful and without just cause or excessive even in the absence of personal hatred, spite or ill will.

Based on the foregoing, it is clear that the Plaintiff failed to establish even a prima facie case on any of these claims, therefore, the Motion for Involuntary Dismissal

is well taken and is hereby granted. The Court will enter a separate Final Judgment in favor of the Defendants against the Plaintiff dismissing the Complaint in this case.

DONE AND ORDERED.