[660 NYS2d 872]

CITY OF NEW YORK, Appellant-Respondent, v ALEX LIBERMAN et al., Defendants, and CESAR TAORMINA et al., Respondents-Appellants.

First Department July 31, 1997

## APPEARANCES OF COUNSEL

*Linda H. Young* of counsel, New York City *(Pamela Seider Dolgow* and *Alan H. Kleinman* on the brief; *Paul A. Crotty, Corporation Counsel* of New York City, attorney), for appellant-respondent.

*Eugene G. Lamb* of counsel, Syosset *(Newmark, Lamb, Monaghan & Marchisio, L. L. P.,* attorneys), for respondents-appellants.

## OPINION OF THE COURT

SULLIVAN, J.

This action arises out of the investigation and prosecution of Alex Liberman, at all times relevant herein the Director of Negotiations for the New York City Department of General Services' Bureau of Leasing (Bureau of Leasing), who, on June 19, 1984, pleaded guilty in Federal court to criminal charges brought against him under the Racketeer Influenced and Corrupt Organizations Act (RICO) for his actions in soliciting the payment of substantial sums from prospective landlords as a condition of his approval of City leases with these landlords.

The subject of this appeal is the City's right to recover the amount of these payments in connection with two such leases. Resolution of the issue turns on whether the making of the payments constituted a bribe, in which case it will be presumed,

as a matter of law, that the rent agreed to by the City was inflated or "loaded" by the amount of the bribe. (*Donemar, Inc. v Molloy*, 252 NY 360, 365.) Thus, the amount of the bribe is recoverable from the one who paid it. In the case of extortion, however, the "one who is victimized by an extortion will not be held civilly liable for the amount of such payments." (*City of New York v Corwen*, 164 AD2d 212, 218, citing *Hornstein v Paramount Pictures*, 292 NY 468, 471-472.) Since the distinction between bribe and extortion is a fine one, a determination as to the nature of the payments to Liberman requires analysis of the facts and circumstances surrounding each payment. The matter is before us on cross appeals after a nonjury trial, the court having allowed a recovery in the case of one of the payments but not in the other.

The facts are not in dispute. The Bureau of Leasing, on behalf of the City, negotiates real estate leases, both commercial and residential, and is responsible for approximately 900 leases, including those for mayoral agencies, the Board of Elections and the community colleges in the City system. Between 1979 and 1983, Liberman personally negotiated 60 to 70 such leases. After negotiating a proposed transaction to the point of agreement, the Bureau of Leasing would submit it to the Board of Estimate for approval.[1]

Pursuant to a lease executed in December 1972, 402 Eastern Parkway, a four-story structure with a basement, located in Crown Heights, Brooklyn, and the focus of the City's appeal, was leased by Santini Brothers to Medgar Evers College, a branch of the City University of New York (CUNY), for a term of 10 years, commencing on the date of occupancy. The building, originally a warehouse, had to be converted to an academic building providing offices and classrooms. Under the 1972 lease, the landlord agreed, at its expense, to make all alterations and improvements, to pay the real estate taxes, assessments and water and sewer charges, and to furnish various services, utilities and maintenance.

President Maintenance Corp., an entity controlled by Cesar Taormina, completed the alterations and managed the building for Santini. In 1977 or 1978, Medgar Evers Enterprises, Inc., another entity controlled by Taormina, purchased the building and thus was the owner of the building at the time of the transactions at issue. As a result of numerous complaints,

---

1. Under the old Charter, pursuant to which these transactions took place, the power to enter into leases was reposed in the Board of Estimate.

Taormina's relationship with the City had become strained. The City took over the cleaning of the building under a "self-help" lease provision, deducting the cost from the monthly rent. Taormina also had problems with CUNY with respect to the payment of taxes.

At this point, Liberman suggested to CUNY that Taormina and CUNY enter into a new lease, with CUNY taking on the obligations that the landlord had failed to provide. CUNY's manager of real estate operations wrote to Liberman on August 27, 1982, formally requesting a renewal of the lease but leaving to Liberman to decide whether the renewal should become effective at the time or at the expiration of the existing lease on January 31, 1984. Although condemnation was considered as an alternative, it was considered too "cumbersome", and the City decided, because a new building to be constructed would not be ready until 1985, to renew the lease. Negotiations for the renewal took place in late 1982.

Under the lease renewal, executed at a time when there were 13 months remaining on the existing lease, the City, now a net lessee, paid $9.25 a square foot, a substantially higher price than the $4.65 per square foot paid under the old lease,[2] and assumed the operating costs. The comparison of $9.25 a square foot under the new lease to $4.65 under the old lease, however, understates the cost of the new lease because it omits the operating costs which the City had to bear as a net lessee. The City's expert estimated those costs at $1.50 a square foot. Thus, the lease negotiated by Taormina with Liberman increased the cost of operating the demised premises (the $9.25 lease cost plus $1.50 in operating costs) from $4.65 per square foot to approximately $10.75. The City's expert, using comparables, testified that the appropriate market rent under the renewal lease should be approximately $7.50 a square foot. And, of course, Taormina received a windfall since the renewal lease, far more favorable to him, commenced 13 months before the expiration of the significantly less favorable former lease, although it also contained a provision allowing the City to cancel after two years. Taormina was obliged to make certain repairs in the nature of "deferred maintenance", that is, repairs that, for the most part, should have been undertaken under the old lease and were estimated to cost in the neighborhood of $350,000 to $400,000.

---

2. As a result of an agreement in 1976 that the City would directly pay all electrical costs, the annual cost of the old lease was actually $195,972 or $3.92 a square foot.

It should be noted that article 14 of the renewal lease, in part, provides, "Landlord warrants and represents that no officer, agent, employee or representative of the City of New York has received any payment or other consideration for the making of this Lease and that no officer, agent, employee or representative of the City of New York has any interest, directly or indirectly, in this Lease or the proceeds thereof."

Subsequent to Liberman's arrest on September 13, 1983, those landlords, including Taormina, who had negotiated leases with Liberman were interviewed. Taormina told an investigator from the New York City Department of Investigations that Liberman advised him that if he paid $5,000 to the Remsen Heights Jewish Center he would receive Liberman's assistance in negotiating a lease for a building, located at 1590 Bedford Avenue in Brooklyn and owned by President Maintenance Corp., which, as noted, was another entity Taormina controlled. In point of fact, all of its terms had been negotiated and agreed to and the Board of Estimate had approved the lease prior to any discussions between Liberman and Taormina. It was in November 1981, when Taormina was to sign the lease, that Liberman first demanded a money payment. Taormina agreed to Liberman's proposal, ultimately succeeded in obtaining the lease and, thereafter, made the $5,000 payment. As the record shows, Liberman's involvement was in expediting, rather than, as he was capable of, hindering the progress of the administrative procedures that had to be undertaken before the lease would take effect.

In September 1982, Taormina and Liberman reached tentative agreement on the renewal lease at 402 Eastern Parkway. When a subsequent dispute arose as to whether Taormina had satisfactorily completed certain repairs that he was obliged to make under the proposed renewal lease before it would take effect, Taormina, in response to Liberman's request for payment of a "percentage of the lease or whatever it was", according to Taormina, delivered to Liberman $175,000 in Port Authority, tax-free, bearer bonds for his assistance in resolving the dispute and consummating the lease renewal. As Taormina subsequently learned, Liberman had advised City officials that Taormina had completed the required renovations at 402 Eastern Parkway. On December 6, 1982, the renewal lease became effective. At his deposition, Taormina testified that it "would be fair to say that the value of the lease exceeded the $175,000 worth of bearer bonds * * * delivered to * * * Liberman." Later, when both were in Florida, Taormina insisted on

a return of the bonds, with which request Liberman complied, but only after having removed coupons worth approximately $5,000.

The IAS Court held that the City was entitled to recover the $5,000 payment for the 1590 Bedford Avenue lease from Taormina and President Maintenance. This is the subject of the cross appeal. As to the second payment, for the 402 Eastern Parkway lease renewal, the court determined that the City was not entitled to recover the illegal $175,000 payment to Liberman despite the fact that, before the Board of Estimate's approval of the new lease, Liberman had demanded of Taormina the payment of $200,000, which the tender of $175,000 in bearer bonds was intended to satisfy. In so holding, the court, citing the lack of comparable buildings with which to compare rents, found that the City had "not met its burden of proving that the new lease was less valuable and economically less favorable to it than would have been the case in a free market" and that therefore, the City had failed to prove that the amount of rent in the lease renewal was excessive. In the order and judgment appealed from, the court dismissed the City's action to recover $175,000, representing the $175,000 bearer bond payment, but ordered that Taormina and President Maintenance pay the City the sum of $5,000, with interest, as to the lease of the 1590 Bedford Avenue premises. To the extent the ruling is adverse, each side appeals. We reverse.

■ Even assuming the correctness of the IAS Court's refusal to credit the City expert's testimony regarding the cost of comparable leases, the court was obliged, on this record, on the basis of *Donemar, Inc. v Molloy* (252 NY 360, *supra)* and its progeny, to award the City the full amount of the $175,000 bearer bond payment. In *Donemar*, the defendant, in the settlement of a disputed claim for goods sold, made a secret payment to an employee of the plaintiff as tribute to his efforts to induce a settlement favorable to the defendant. In an action to recover the corrupt payment, the trial court charged, in part, that, unless the plaintiff established some disparity between the value of the goods received and the consideration it paid in settlement of the claim for the goods sold, nominal damages only could be awarded. Of course, in such circumstances, had there been proof of a disparity in the value of the goods and the sales price paid, the purchaser could recover the overpayment. The jury, implicitly finding a corrupt agreement and the faithless employee's part in the settlement, returned a verdict in favor of the plaintiff for the sum of six cents. Noting that

the entire transaction is not nullified by the illegal payment, the Court of Appeals held, "If, however, a vendor bribes a purchaser's agent it must be assumed that the purchase money is loaded by the amount of the bribe. The vendor has had and received money which belongs to the purchaser to the extent of the bribe which neither the vendor nor the unfaithful agent may in conscience and good morals retain." (*Supra*, at 365.) Thus, even in the absence of proof that the renewal lease called for rent payments in excess of the market rate, as is the case here by virtue of the trial court's finding, which is not challenged on appeal, the City is entitled to recover the amount of the bribe paid to Liberman on the ground that the cost of the renewal lease is presumed to be loaded to the extent of the amount of the bribe.

The IAS Court's decision suggests that, in light of Liberman's return of the bearer bonds, the damages allowed under the *Donemar* rationale would be limited to $5,000, the worth of the coupons retained by Liberman. Liberman's subsequent return of the bonds is irrelevant. By bribing Liberman with a $175,000 payment to secure the lease, it is presumed, pursuant to *Donemar*, that Taormina would have accepted a lease less favorable to him by that amount.

*Donemar*, decided over 65 years ago, retains its vitality to this day. Indeed, 11 years after *Donemar* was decided, the Court of Appeals awarded damages equal to an illicit payment "on the theory that the purchaser was willing to pay that much more than the stated purchase price." (*Wechsler v Bowman*, 285 NY 284, 292.) In the leading Federal case, *Continental Mgt. v United States* (527 F2d 613 [Ct Cl]), the Government filed a counterclaim seeking to recover from the plaintiffs an amount equal to the sum of the bribes paid to Federal employees responsible for appraising property and approving applications for mortgage insurance. Even though there was no proof or suggestion that the bribes were related, in any specific way, to the mortgage transactions sued upon, the court, adopting the *Donemar* rationale, held that "it is enough [for the government] to show the fact and amount of the bribes—nothing further need be alleged or proved by way of specific or direct injury." (*Supra*, at 618.) *Continental Mgt.* was cited with approval in *City of New York v CitiSource, Inc.* (679 F Supp 393 [SD NY]), where the court held that, when a contract is procured through bribes to an agent of one of the contracting parties, the defrauded principal is entitled to recover as damages, *inter alia*, the amount of the bribes. (*Supra*, at 398; *see,*

*British Am. & E. Co. v Wirth, Ltd.*, 592 F2d 75, 80 [2d Cir] ["strong public policy against all kinds of bribery requires that injury be presumed"].)

In cases of bribery of a public official, the Court of Appeals has adopted an even more stringent rule than the one in *Donemar*. Vendors that corrupt public officials forfeit their right to all payments due under the tainted transaction. (*See, e.g., S. T. Grand, Inc. v City of New York*, 32 NY2d 300; *see also, Jered Contr. Corp. v New York City Tr. Auth.*, 22 NY2d 187; *Gerzof v Sweeney*, 22 NY2d 297.) "The result may be harsh, but it is necessary in cases where the bribery of municipal officials is confirmed." (*S. T. Grand, Inc. v City of New York, supra*, 32 NY2d, at 307.) It is, as the *Jered* Court explained, "a matter of grave public concern that there be absolute honesty in the procuring of a public contract." (22 NY2d, *supra*, at 193.) While the City, except for the amount of the payments to Liberman, has not sought such relief here, the policy underlying *Jered, Gerzof* and *S. T. Grand*, that those who engage in corrupt acts with public officials are subject to serious civil consequences, provides an independent basis for the awarding, at an absolute minimum, of damages equal to the amount of the bribe.

Even if the *Donemar* presumption is considered rebuttable, Taormina and President Maintenance failed to offer proof rebutting it. The City's failure to obtain damages based on a comparison of the cost of the former lease with that of the renewal was, the court found, due to a lack of proof as to comparable leases in the immediate neighborhood, Taormina and President Maintenance having successfully argued that the 402 Eastern Parkway property was unique. They were, therefore, in no position to show from comparable leases that the renewal rent was not above market value. Thus, whether rebuttable or not, the *Donemar* presumption applies to the payment of the $175,000 bribe to Liberman with respect to the renewal of the 402 Eastern Parkway lease.

The $5,000 payment to a charity at Liberman's direction with respect to the 1590 Bedford Avenue property, however, presents a different situation. According to the City's own expert, the City paid less than a market value rent under the lease. Moreover, all of the negotiations were directly conducted by Taormina and the Board of Education, without any involvement by Liberman. The terms of the lease were agreed upon before any discussions ever took place between Liberman and Taormina. Thus, the evidence demonstrates, without contradiction, that the lease rental could not have been loaded by the

amount of Taormina's $5,000 contribution to Liberman's designated charity since the terms of the lease had already, prior to his entry into the matter and without any assistance from Liberman, been negotiated and agreed upon. Liberman's sole involvement was in rendering administrative services to the Board of Education in the final approval process. The Board of Estimate approved the lease on September 24, 1981. Thereafter, on November 9, 1981, when Taormina was about to sign the lease, Liberman, with the power to delay the effective commencement of the lease, made his demand for a $5,000 contribution to perform some of the ministerial tasks that were within the scope of the administrative services provided by the Department of General Services. This unchallenged evidence makes clear that what was involved was an extortion by Liberman under Penal Law § 155.05. The extortionate demand was effective because Taormina, in order to obtain the negotiated lease, had already made necessary alterations and improvements to the building and incurred the costs thereof, the reimbursement for which he could not obtain until the lease became effective.

Accordingly, the order and judgment (one paper), Supreme Court, New York County (Herman Cahn, J.), entered September 18, 1995, after a nonjury trial, should be reversed, on the law, without costs or disbursements, the City awarded $175,000 and the $5,000 award vacated.

MURPHY, P. J., MILONAS and MAZZARELLI, JJ., concur.

Order and Judgment (one paper), Supreme Court, New York County, entered September 18, 1995, reversed, on the law, without costs or disbursements, the City awarded $175,000 and the $5,000 award vacated.