In re Joseph LUPPINO, Debtor.

NOVARTIS CORPORATION f/k/a Ciba–
Geigy Corporation, Plaintiff,

v.

Joseph LUPPINO, Defendant.

Bankruptcy No. 96 B 21601 (ASH).
Adversary No. 97–5063A.

United States Bankruptcy Court,
S.D. New York.

May 18, 1998.

Piper & Marbury, L.L.P., by Andrew L. Deutsch, Christina L. Nargolwala, New York City, for Plaintiff–Creditor.

Massoud & Pashkoff, P.C., by Ahmed A. Massoud, New York City, for Defendant–Debtor.

## DECISION ON DISCHARGEABILITY UNDER SECTIONS 523(a)(2), (4) AND (6)

ADLAI S. HARDIN, Jr., Bankruptcy Judge.

On June 19, 1996 a judgment in the amount of $1,281,072.88 was entered in an action in Supreme Court of the State of New York, County of Westchester (the "State Court Action") in favor of plaintiff Ciba–Geigy Corporation, now known as Novartis Corporation ("Ciba–Geigy" or "Novartis") against debtor-defendant Joseph Luppino ("Luppino"). The judgment was entered on a special jury verdict finding Luppino liable for having committed acts of commercial bribe receiving and for having breached his duty of loyalty as an employee of Ciba–Geigy. Thereafter Luppino filed a petition in this Court under Chapter 13 which was converted to a Chapter 7 proceeding on September 17, 1996. Novartis commenced this adversary proceeding seeking a determination that the entire amount of the judgment is non-dischargeable under 11 U.S.C. § 523(a)(2), (4) and (6).

Novartis has moved for summary judgment, and Luppino has cross-moved for summary judgment. Both sides have submitted statements of undisputed facts pursuant to Local Bankruptcy Rule 7056–1, but neither side has controverted any of the facts claimed by the other to be undisputed, and neither side has argued that there is any genuine dispute as to a material fact requiring a trial.

Local Bankruptcy Rule 7056–1 provides as follows:

> On any motion for summary judgment pursuant to Bankruptcy Rule 7056, there shall be annexed to the notice of motion a separate, short, and concise statement of the material facts as to which the moving party contends there is no genuine issue to

be tried. Failure to submit the statement shall constitute grounds for denial of the motion. Papers opposing a motion for summary judgment shall include a separate, short, and concise statement of the material facts as to which it is contended that there is a genuine issue to be tried. All material facts set forth in the statement required to be served by the moving party shall be deemed admitted unless controverted by the statement required to be served by the opposing party.

One of the most critical and, at times, difficult determinations to be made on a motion for summary judgment is whether there exist any *genuine* issues of *material* fact requiring a trial. Local Rule 7056–1 is designed to facilitate that determination. The Rule requires the moving party to present a "short, and concise" statement of the facts on which the movant relies in seeking judgment. What is contemplated obviously is not a compendium of evidence in narrative form, but rather a concise distillation of those crucial facts which are truly determinative of the outcome of the case. In response, the opposing party is required by the Rule to show which of plaintiff's claimed undisputed facts are the subject of genuine dispute. To accomplish this objective, the Rule obviously contemplates that the opposing party will respond with particularity to each of plaintiff's claimed undisputed facts, demonstrating as to each fact why there is a genuine dispute if such is the claim. Of course, the opposing party is certainly free to present its own statement of facts, but it must respond with particularity to the movant's statement if it wants to controvert the movant's facts.

In its Rule 7056–1 Statement Novartis has set forth in simple, declarative sentences the matrix of facts which it contends are incapable of genuine dispute and entitle it to judgment as a matter of law. Luppino has made no attempt to comply with his obligation under Rule 7056–1 to submit a "short, and concise statement of the material facts as to which it is contended that there is a genuine dispute to be tried." Nowhere does Luppino address the factual recitations in Novartis' Statement or attempt to demonstrate on a paragraph-by-paragraph basis that there is any dispute as to the facts which are set forth in Novartis' Statement.

The consequence of Luppino's failure to controvert with particularity any of the facts in Novartis' Statement is set forth in Rule 7056–1. The Rule states in the last sentence:

All material facts set forth in the statement required to be served by the moving party *shall be deemed admitted unless controverted* by the statement required to be served by the opposing party. (emphasis supplied)

Accordingly, the facts in Novartis' Statement shall be "deemed admitted," and the Court will proceed on the assumption that there is no triable issue of fact with regard to the facts set forth in that Statement, since Luppino has provided no evidentiary basis to conclude otherwise.

This Court has jurisdiction of this case under 28 U.S.C. §§ 1334(a) and 157(a). This is a core proceeding under 28 U.S.C. § 157(b).

### Background

The undisputed facts may be briefly summarized.

Luppino was employed by Ciba–Geigy from 1962 through October 15, 1990. From 1983 or 1984 through October 15, 1990 Luppino held the position of Director of Data Processing, a managerial level job one step below vice president. The Department of Data Processing was responsible for running the computer and telecommunications networks for the Corporation. From 1983 through 1990, due to rapid technological change in the computer industry Ciba–Geigy leased almost all of the computer equipment needed in its business. An important aspect of Luppino's duties as Director of Data Processing was to determine Ciba–Geigy's need for computer equipment and the terms of proposed computer leases, to evaluate competing bids from leasing companies and to make recommendations to senior Ciba–Geigy management regarding vendors and lease terms.

At all relevant times, Ciba–Geigy had a clear policy barring its employees from accepting, directly or indirectly, payment, services, loans, gifts, trips, entertainment or oth-

er favors from other persons or organizations with whom the Company did business, without the approval of a superior. As Director of Data Processing, Luppino supervised approximately 80 employees, and he was aware of Ciba–Geigy's policy banning acceptance of things of value from companies, persons or organizations with which the Company did business. Luppino was aware of this policy and that it applied to the 80 employees he supervised. He was also aware that the policy applied to him, and that as a manager he was obliged to terminate the employment of any subordinate employees who violated this company policy. Luppino knew it was morally wrong and against the law to accept a bribe or kickback from a vendor to Ciba–Geigy, as well as being against Ciba–Geigy policy.

In the summer of 1983 Charles Kessler ("Kessler"), the President of New England Financial Corporation ("NEFC"), approached Luppino regarding the possibility of doing business with Ciba–Geigy. Kessler proposed to Luppino that if Luppino helped NEFC to become an approved lessor of computer equipment to Ciba–Geigy, and NEFC succeeded in obtaining leases from Ciba–Geigy, NEFC would pay Luppino one-third of NEFC's profit on those leases. Luppino agreed to this scheme. At that time (summer 1983), NEFC was not on Ciba–Geigy's approved bidders list for computer equipment leases and was not active in the computer leasing market. Through Luppino's efforts, Ciba–Geigy put NEFC on its approved list of computer lease bidders in December of 1983. NEFC almost immediately began to bid, successfully, on Ciba–Geigy computer leases.

In 1984 Kessler, who was also a certified public accountant, recommended that Luppino form a personally-owned corporation to which NEFC would make its kickback payments. Such a corporation could shelter the income through tax write-offs, pay Luppino a salary and permit him to maintain a pension plan and write off an automobile as a corporate expense. Luppino agreed to this arrangement and organized DTA Consultants, Inc. ("DTA"). At all relevant times Luppino was the sole shareholder of DTA. Kessler

set up DTA for Luppino and served as DTA's accountant through and including the time of trial in the state court.

From 1983 until he was terminated as a Ciba–Geigy employee in October 1990, Luppino recommended to his superiors that Ciba–Geigy accept many NEFC bids, and these recommendations were almost always accepted by his superiors. During this period, approximately 80% of NEFC's total leasing business came from Ciba–Geigy, for an approximate lease value total of $5 million. During this same period, Luppino, regularly provided NEFC with information, including "residual value forecasting services," which materially assisted NEFC in bidding and obtaining leasing business from Ciba–Geigy. NEFC won about 80% of the Ciba–Geigy leases on which it bid.

During the period from 1984 through October 1990, NEFC paid $117,317 to Luppino's corporation, DTA. This figure constituted one-third of the profits NEFC made on its leases with Ciba–Geigy.

At no time prior to his termination as an employee of Ciba–Geigy in October 1990 did Luppino disclose to Ciba–Geigy the existence or his ownership of DTA, his receipt of the payments totalling $117,317 from NEFC or any other facts concerning his personal arrangements with Kessler and NEFC. Ciba–Geigy did not learn about Luppino's secret arrangements with Kessler and NEFC and his ownership or the existence of DTA until after termination of Luppino's employment in October 1990.

In October 1990, after Ciba–Geigy management received a complaint for sexual harassment from a Company employee who was a subordinate of Luppino, and after investigating the woman's charges, Ciba–Geigy discharged Luppino. Luppino then commenced the State Court Action alleging wrongful discharge and other claims against Ciba–Geigy and the woman. In the course of discovery, Ciba–Geigy learned of the facts relating to Luppino's relationship with Kessler and NEFC. Based upon these facts, Ciba–Geigy counterclaimed against Luppino, DTA, Kessler and NEFC alleging, *inter alia*, that Luppino's conduct was commercial bribery, violated the Donnelly Act and was a

breach of fiduciary duty. Prior to trial, Ciba–Geigy settled with Kessler and NEFC. Luppino's claims against Ciba–Geigy were dismissed prior to trial, and Ciba–Geigy's counterclaims against Luppino and DTA proceeded to trial.

After a four-day trial, in May 1996 the jury rendered a verdict in favor of Ciba–Geigy and against Luppino. In the special verdict questionnaire, the jury found (1) that Luppino committed acts of commercial bribe receiving and that the percentage of fault for this part of the verdict should be split 50% each between Luppino and Kessler/NEFC, (2) that Luppino breached his duty of loyalty to Ciba–Geigy from June 11, 1984 to October 15, 1990, and (3) that Ciba–Geigy was entitled to recover $175,000 punitive damages from Luppino. Based upon the jury verdict, the Supreme Court, Hon. Donald N. Silverman, J.S.C., rendered judgment on June 18, 1996 as follows:

(a) on Ciba–Geigy's claims for violation of Section 340 of the General Business Law and for commercial bribery, $175,-695.50 [1] in damages, with interest $77,-075 and attorneys' fees of $50,000, making in total for these claims the sum of $302,771.10 [sic: the correct calculation is $302,770.50];

(b) on Ciba–Geigy's claim for breach of fiduciary duty of loyalty, the sum of $535,477 [2] in damages, together with interest of $267,824.78, for a total on this claim of $803,301.78;

(c) punitive damages in the amount of $175,000;

making in total the sum of $1,281,072.88 [sic].

### Certain Facts Not Relevant

Certain facts included in Novartis' Statement under Rule 7056–1 (viz ¶¶ 7, 19, 20), although not directly controverted by Luppino, appear to be the subject of some disagreement judging by Luppino's Statement under Rule 7056–1. The facts contained in these paragraphs, relating to such matters as the reliance of Luppino's superior, Linda Repaci, on Luppino's recommendations, Novartis' need for six-year as opposed to three-year leases, Luppino's disclosure of purportedly confidential information to NEFC, "residual value" calculations, among other matters, are unnecessary to any of the determinations made by this Court on the parties' cross-motions for summary judgment. The conclusions reached in this decision are based on the recitation of facts set forth above and upon the jury verdict and judgment of the court in the State Court Action.

The recitation of facts set forth in Luppino's Statement under Rule 7056–1 appears more appropriate for contesting the jury verdict and judgment in the State Court Action. The jury verdict and judgment, however, are res judicata and are binding upon the parties and this Court in this adversary proceeding. They cannot be relitigated here by Luppino, and to the extent relevant to issues arising under Section 523(a), they are binding on this Court under the doctrine of collateral estoppel. Luppino's Statement does not controvert the undisputed facts on which the conclusions set forth below are based.

### Discussion and Conclusions

#### Section 523(a)(4)

Section 523(a)(4) of the Bankruptcy Code provides that Section 727 does not discharge an individual debtor from any debt

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny.

Neither embezzlement nor larceny is implicated in this case. Thus, the question here is whether the state court judgment or part of it constitutes a debt for fraud or defalcation while acting in a fiduciary capacity. The precise issue presented is whether Luppino was acting in a "fiduciary capacity" as Di-

---

1. This figure is calculated by trebling the $117,-317 of bribes and kickbacks received by Luppino, as required by the Donnelly Act, to yield $351,-391 [sic: the correct calculation is $351,951], reduced by 50% of fault attributable to Kessler/NEFC to yield the sum of $175,695.50 [sic: the correct calculation is $175,975.50].

2. This figure represents the salary and benefits paid by Ciba–Geigy to Luppino during Luppino's period of disloyalty.

rector of Data Processing at Ciba–Geigy during the period 1984 through October 1990.

It is true that Luppino was held liable on a state law cause of action for breach of fiduciary duty as an employee of Ciba–Geigy. The jury verdict and the judgment of the state court with respect to that state law claim are res judicata as between the parties and cannot be relitigated in this Court. But the concept of "fiduciary" under Section 523(a)(4) of the Bankruptcy Code is different from and narrower than analogous state law concepts. The meaning and scope of the term "fiduciary" under Section 523(a)(4) has been discussed at length in *In re Zoldan*, 221 B.R. 79 (Bankr.S.D.N.Y.1998), and reference is made to that decision for the views of this Court on the issue. The issue in *In re Zoldan* was whether a general partner acting in respect to partnership property could be deemed a fiduciary under Section 523(a)(4).

The question here is whether Luppino as a management level employee was acting in a fiduciary capacity. Under applicable precedents, I conclude that he was not. The Second Circuit in *Irving Trust Co. v. Deutsch*, 73 F.2d 121, 125 (2d Cir.1934), *cert. denied*, 294 U.S. 708, 55 S.Ct. 405, 79 L.Ed. 1243 (1935), *reh'g denied*, 294 U.S. 733, 55 S.Ct. 514, 79 L.Ed. 1262 (1935), stated that "[a] mere employee of a corporation does not ordinarily occupy a position of trust or confidence toward his employer unless he is also an agent in respect to the matter under consideration". To the same effect, the court in *Lind v. Vanguard Offset Printers, Inc.*, 857 F.Supp. 1060, 1067 (S.D.N.Y.1994) stated that, "under New York law, an employer-employee relationship is not fiduciary in nature". *See also, Community Mutual Savings Bank v. Landrin (In re Landrin)*, 173 B.R. 307, 311 (Bankr.S.D.N.Y.1994) ("Landrin and the Bank had a traditional employee employer relationship which relationship is insufficient to rise to the level of a fiduciary for purposes of § 523(a)(4)"); *Ohio Co. v. Maynard (In re Maynard)*, 153 B.R. 933, 935 (Bankr.M.D.Fla.1993); *Shearson Lehman Hutton Mortgage Co. v. Gierman (In re Gierman)*, 106 B.R. 733, 737 (Bankr.M.D.Fla. 1989); *Mullis v. Walker (In re Walker)*, 7 B.R. 563, 564 (Bankr.M.D.Ga.1980). Under the above-mentioned caselaw and the analysis as set forth in *In re Zoldan*, supra, I conclude that Luppino's employment position did not rise to the level of "fiduciary" as required under § 523(a)(4).

■ Novartis cites *Compugraphic Corp. v. Golden (In re Golden)*, 54 B.R. 957, 964 (Bankr.D.Mass.1985), *American Machinery & Engineering Corp. v. Entrekin (In re Entrekin)*, 40 B.R. 435, 436 (Bankr.S.D.Fla. 1984) and *Trevor Steel Company v. Eisner (In re Eisner)*, 35 B.R. 86 (Bankr.N.D.Ohio 1983) for the proposition that "fiduciary capacity" within the meaning of § 523(a)(4) may be found in an employment relationship where the employee has access to control over disbursement of corporate funds. I disagree with this proposition as it has overbroad implications and does not comport with the standards as discussed in *In re Zoldan* requiring the existence of an express or technical trust. For these reasons I reject the proposition as advocated by Novartis.

### Section 523(a)(6)

■ Section 523(a)(6) of the Bankruptcy Code excepts from discharge debts

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity[.]

This Court has had occasion recently to publish a decision on Section 523(a)(6) in the case of *In re Blankfort*, 217 B.R. 138 (Bankr. S.D.N.Y.1998). Without repeating the analysis or the citation of cases set forth in *Blankfort*, this Court's views on the requirements for asserting a claim under Section 523(a)(6) may be summarized as follows in the context of the facts presented in this adversary proceeding. The key term in subsection (6), and the one that has generated the most controversy among the courts, is the word "malicious." The basic issue is whether this term requires a showing of intent on the debtor's part to inflict injury on the creditor (referred to as actual or Biblical malice), or whether some lesser standard is contemplated by the statute, such as an intent to do the act causing the harm coupled with knowledge that the act will cause the harm or, lesser still, reckless disregard of the harmful consequences of the act. The Supreme Court, in a

decision by Justice Ginsburg in *Kawaauhau v. Geiger,* —— U.S. ——, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998), appears to have instructed that actual or Biblical malice is required. The Court stated, "[t]he word 'wilful' in (a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury". The Second Circuit in *Navistar Financial Corp. v. Stelluti (In re Stelluti),* 94 F.3d 84 (2d Cir.1996), has ruled that actual malice may be proved by circumstantial evidence of the facts and circumstances surrounding the debtor's conduct.

Certain types of conduct, such as assault, may be inherently and patently malicious. Actual malice may be an essential element of some causes of action, such as malicious prosecution. In other claims, actual malice may be inferred or imputed, for example, from the fact that the debtor's conduct giving rise to liability has no potential for economic gain or other benefit to the debtor, from which one could only conclude that the debtor's motivation must have been to inflict harm upon the creditor. In all of these cases, the element of actual malice may be easily deduced from the facts.

 In most cases, however, the debtor's conduct giving rise to liability is clearly motivated by some profit or gain or other benefit to the debtor. This was the case in *In re Blankfort,* where the debtor was held liable in collateral litigation for breach of contract and trademark infringement by operating a Rent–A–Wreck franchise after the franchise agreement had terminated. In such a case, the underlying conduct, however deplorable, would not give rise to liability under Section 523(a)(6) in the absence of some additional, aggravating conduct on the part of the debtor of sufficient gravity to warrant an inference of actual malice under the Second Circuit decision in *In re Stelluti.* As stated by this Court in *In re Blankfort,* the statutory element of maliciousness may be inferred from circumstantial evidence where the debtor has breached a duty to the plaintiff founded in contract, statute or tort

law, willfully in the sense of acting with deliberate intent, where it is evident that the conduct will cause injury to the plaintiff and, most important, and under some additional, aggravating circumstance such as to warrant an inference of malice and denial of discharge.[3] An ordinary tort or breach of contractual or statutory duty generally is not sufficient to deny discharge under subsection (6) without some aggravating circumstance evidencing conduct so reprehensible as to warrant denial of the "fresh start" to which the "honest but unfortunate" debtor would normally be entitled under the Bankruptcy Code.

 Applying the analysis set forth in *Kawaauhau, Stelluti* and *Blankfort,* I do not find any factual predicate to hold Luppino's judgment indebtedness to Novartis to be non-dischargeable under Section 523(a)(6). Acknowledging the deplorable nature of the conduct for which Luppino was held liable in the State Court Action, the test for non-dischargeability under Section 523(a)(6) is not greed or the gravity of misconduct, but actual malice. Actual malice (intent to inflict harm on Ciba–Geigy) was not a necessary element of the causes of action asserted by Ciba–Geigy against Luppino in the State Court Action. Even if the receipt of commercial bribes and betrayal of state law duties of employee loyalty could be said to necessarily inflict economic damage on an employer (a proposition contested by Luppino), the creditor must allege and prove additional, aggravating facts and circumstances sufficient to give rise to an inference of actual malice under *Stelluti* and *Blankfort,* and no such additional, aggravating facts and circumstances beyond the underlying causes of action are alleged by Novartis in this adversary proceeding.

 Novartis argues that in order to impose punitive damages, the jury necessarily had to find that Luppino's breach of fiduciary duty of loyalty was "wanton and reckless or malicious" under New York law, citing *Camillo v. Olympia & York Prop. Co.,* 157 A.D.2d 34, 554 N.Y.S.2d 532 (1st Dep't 1990). First,

---

**3.** The additional aggravating circumstance in *Blankfort* was the debtor's persistent, blatant and willful violation of court orders enjoining the underlying conduct.

nothing in the state court justice's jury instructions has been called to this Court's attention which would support the conclusion that the jury had to make a finding of malice in order to impose punitive damages under New York law. Second, Novartis' articulation of malice may or may not be an accurate statement of state law, but it does not accord with the requirements of a showing of malice under Section 523(a)(6) of the Bankruptcy Code as articulated by the Supreme Court, the Second Circuit and this Court in *Kawaauhau*, *Stelluti* and *Blankfort*.

### Section 523(a)(2)(A)

Section 523(a)(2)(A) of the Bankruptcy Code excepts from discharge a debt

(2) for obtaining money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud....

In this case, neither Ciba–Geigy's state court complaint nor Novartis' complaint in this adversary proceeding alleges either "a false representation" or "actual fraud." Accordingly, the questions presented here are whether Luppino's conduct in receiving commercial bribes constituted "false pretenses" within the meaning of Section 523(a)(2)(A) and, if so, whether all or any part of the state court judgment constituted a debt "for obtaining money ... obtained by—(A) false pretenses...."

■ At the outset, it is important to consider the actual wording used by Congress in subsection (A)—*"false pretenses, a false representation, or* actual fraud." The use of the words "false pretenses" and the disjunctive "or" make clear that Congress intended to bring within the scope of this exception to discharge conduct which does not include an actual false representation and does not constitute actual fraud in the classical sense. That being the case, one cannot put a straightjacket around the words "false pretenses" by a literal adherence to the classic "five fingers" of fraud, namely (1) a representation, (2) falsity, (3) scienter, (4) reasonable or justifiable reliance and (5) damage. As the Supreme Court said in *Carpenter v.*

*United States,* 484 U.S. 19, 27, 108 S.Ct. 316, 321, 98 L.Ed.2d 275, 284 (1987), in the context of criminal mail fraud, "the words 'to defraud' ... have the 'common understanding' of 'wronging one in his property rights by dishonest methods or schemes' and 'usually signify the deprivation of something of value by trick, deceit, chicane or over-reaching.'" *See* the analysis in *In re Leventhal,* 194 B.R. 26, 28–31 (Bankr.S.D.N.Y. 1996), written in the context of a debtor's obtaining money by use of a credit card, which clearly does not involve "actual fraud" in the classic sense but may involve false pretenses within the meaning of Section 523(a)(2)(A).

■ That is not to say that the basic elements of wrongdoing inherent in fraud need not be proved to establish a claim of non-dischargeability for "false pretenses." Although false pretenses do not require proof of (1) a representation which is (2) false, as in classic fraud, it must be demonstrated that the debtor engaged in conduct, to paraphrase the Supreme Court in *Carpenter v. United States,* "wronging one in his property rights by dishonest methods or schemes [such as] deprivation of something of value by trick, deceit, chicane or overreaching." Element (3), scienter or intent, certainly must be proved because courts will not deny a discharge based on conduct which is innocent or merely negligent. With respect to element (4), it is not meaningful to examine into the "justifiable reliance" of a creditor in the case of fraudulent or deceitful conduct involving non-disclosure or concealment. But "reliance" in classic fraud is, in reality, nothing more nor less than the element of causation, since it is the creditor's reliance which provides the causal link between the debtor's false representation and the creditor's damage. Thus, in a case involving false pretenses or fraud based upon the debtor's non-disclosure or concealment, classic reliance cannot and need not be proved, but the creditor must nevertheless establish a causal link between the debtor's misconduct and the creditor's injury. Finally, the element of damage certainly must be proven in any claim for fraud, deceit or false pretenses generally and under the language of this

particular statute, which declares non-dischargeable a debt "(2) *for obtaining money* ... to the extent obtained by (A) false pretenses...."

In the context of this case, the foregoing conceptual analysis must be applied to each element of the state court judgment to determine dischargeability under Section 523(a)(2)(A). The first component of the judgment is the $175,695.50 in damages based on the $117,317 of bribes and kickbacks received by Luppino, calculated as set forth in footnote 1, above. I conclude that this component of the judgment satisfies all the factual elements necessary for non-dischargeability under Section 523(a)(2)(A). With respect to classic fraud elements (1) and (2), there can be no question that Luppino's conduct in receiving $117,317 of commercial bribes constituted "false pretenses" under any definition of that term, and certainly under the "common understanding" of the concept of fraud articulated by the Supreme Court in *Carpenter v. United States,* as "wronging one in his property rights by dishonest means or schemes ... usually signify[ing] the deprivation of something of value by trick, deceit, chicane or overreaching." There can be no argument that commercial bribery is a wrongful act, a dishonest scheme, a deceit and a chicane—it is a crime under New York law and the laws of most jurisdictions, and Luppino acknowledged that it was immoral conduct and a violation of Ciba–Geigy written corporate policy mandating termination of employment. The fact that Luppino received $117,317 of commercial bribes was conclusively established by the jury verdict, and there is no dispute that his activities in connection with the kickback scheme were carried out in secret and in violation of his duty to disclose such matters to his superiors as an employee of Ciba–Geigy.

With regard to element (3), scienter, it is sufficient to point out that an essential element of either a criminal prosecution or a civil action for commercial bribery is intent. One cannot be convicted or held liable for damages for innocent, unintentional or negligent receipt of kickbacks—an "innocent commercial bribe" is an oxymoron in the law.

Luppino does not argue that he did not knowingly and intentionally receive the $117,317 from NEFC. He may have argued in the State Court Action that there was no illicit quid pro quo, or that the payments were legitimate "consulting fees," but the jury rejected any such arguments and found Luppino liable for receiving commercial bribes. Any arguments by Luppino based on lack of scienter are barred under the doctrine of collateral estoppel. Nor can there be any question as to Luppino's intent to deceive Ciba–Geigy. It is undisputed that Luppino knew that his receipt of kickback payments from his employer's vendor was wrongful, immoral and a violation of Ciba–Geigy's written corporate policy mandating termination of employment. Knowing that Ciba–Geigy would have no reason to discover the secret scheme which he agreed upon with Kessler or the payments which were funneled through his undisclosed personal corporate entity, DTA, Luppino knowingly failed to disclose the facts to Ciba–Geigy, knowingly in violation of corporate policy and in violation of his state law duty as an employee.

Elements (4) and (5), reliance and damage, need to be considered together in the context of this adversary proceeding. Viewing the reliance issue in the traditional sense, one could say that an employer "relies" on its employees to conduct their duties with integrity and in compliance with law and the company's own written rules and standards of conduct. In this limited sense, Ciba–Geigy "relied" on Luppino's compliance with New York State law and the Company's written policies respecting commercial bribery by continuing Luppino's employment in the sensitive and important position of Director of Data Processing from 1984 until October 15, 1990. But the outcome here should not turn on a technical definition or finding of "reliance," because the real point at issue under element (3) is causation. The causation issue is whether the damages sustained were in fact caused by the conduct constituting false pretenses, which is what gives rise to non-dischargeability under Section 523(a)(2)(A). There can be no doubt of the causal relationship between the damages sustained by Ciba–Geigy, to wit, the $117,317 of kickbacks

received by Luppino [4] and Luppino's conduct constituting false pretenses, to wit, his participation in the commercial bribery scheme. The fact that the $175,695.50 damage award represents the $117,317 of bribes and kickbacks, trebled as required by the Donnelly Act and reduced by 50% of fault attributed in the jury verdict to Kessler/NEFC does not change the character of the full $175,695.50 figure as damages. For purposes of dischargeability, the Supreme Court has held that where a liability which is non-dischargeable is subjected to trebling or other increase under non-bankruptcy law for punitive or deterrence purposes, the entire amount of the judgment as trebled or otherwise increased is non-dischargeable. *Cohen v. de la Cruz,* —— U.S. ——, ——, 118 S.Ct. 1212, 1217–19, 140 L.Ed.2d 341 (1998).

For the foregoing reasons, I hold that the $175,695.50 portion of the state court judgment representing damages for violation of the New York General Business Law and for commercial bribery is non-dischargeable under Section 523(a)(2)(A).

▮ The state court judgment included $77,075 of interest and attorneys' fees of $50,000 specifically in respect of the $175,-695.50 award of damages for commercial bribery. Under the recent decision of the Supreme Court in *Cohen v. de la Cruz,* —— U.S. at ——, 118 S.Ct. at 1219, interest and attorneys' fees awarded in respect of a debt which is non-dischargeable are also non-dischargeable. Accordingly, the $77,075 of interest and $50,000 of attorneys' fees included in the state court judgment are non-dischargeable under Section 523(a)(2)(A).

▮ The special verdict of the jury awarded punitive damages in favor of Ciba–Geigy against Luppino in the amount of $175,000. It must be presumed that punitive damages were awarded by the jury on account of the commercial bribery, as opposed to the jury's finding that Luppino breached his duty of loyalty as an employee of Ciba–Geigy, since the breach of the duty of loyalty was predicated upon the commercial bribery, and not upon any separate or independent wrongdoing. As noted above, punitive damages awarded in respect of an underlying debt for conduct which is non-dischargeable under Section 523(a) are also held to be non-dischargeable. *Id.* at —— – ——, 118 S.Ct. at 1217–18. Accordingly, the punitive damage award of $175,000 is non-dischargeable under Section 523(a)(2)(A).

▮ The $803,301.78 damage award for breach of fiduciary duty of loyalty (comprising $535,477 of salary and benefits paid to Luppino during his period of disloyalty plus interest thereon of $267,824.78) is on a different footing. The breach of fiduciary duty of loyalty claim is a fundamentally different cause of action from Ciba–Geigy's other claims, already discussed, based upon commercial bribery. Under New York law it appears, and the judgment in the State Court Action so provides, that an employer is entitled to recover from its faithless employee salary and emoluments paid during the period of the employee's breach of loyalty. That is the law of the case as between Luppino and Novartis, and the judgment is binding upon and entitled to full faith and credit in this Court. It does not follow, however, that

---

4. Luppino argues that Novartis has not alleged or proved any damages as a consequence of the commercial bribery and, in fact, that Ciba–Geigy benefitted from his illicit relationship with Kessler and NEFC every time NEFC submitted the lowest bid and was awarded a contract by Ciba–Geigy. The difficulty with Luppino's position on the damage issue is that it is the law of the State of New York that an employer is presumed to have suffered damage in at least the amount of the kickbacks received by the faithless employee. *See Donemar v. Molloy,* 252 N.Y. 360, 169 N.E. 610 (1930); *City of New York v. Liberman,* 232 A.D.2d 42, 660 N.Y.S.2d 872, 875–76 (App. Div.1st Dep't 1997); *Sears Roebuck & Co. v. Kelly,* 1 Misc.2d 624, 149 N.Y.S.2d 133 (Sup.Ct. 1956); *see also* N.Y. Penal Law §§ 180.00 and 180.03. The New York rule of law is premised on the several propositions that (i) the misconduct generally associated with commercial bribery (such as disclosure of confidential information, undue influence in decision-making, etc.) is almost certain to adversely affect the employer economically, (ii) the nature and quantification of economic damage suffered is generally impossible to determine, (iii) the wrongdoer should not profit by his employer's inability to quantify the damage resulting from his wrongdoing and (iv) the commercial briber/vendor obviously could have reduced its price to the employer by the amount of the kickback paid to the faithless employee without economic consequence to the vendor.

the judgment meets the test for non-dischargeability under the Bankruptcy Code.

 The issue under Section 523(a)(2)(A) is whether the $803,301.78 judgment for breach of fiduciary duty of loyalty constitutes "a debt (2) for obtaining money ... *to the extent obtained by* —(A) false pretenses ...." The words "to the extent obtained by" are words of causal limitation. The portion of the state court judgment based upon the $117,317 of kickbacks obtained by Luppino undoubtedly constituted a debt for obtaining money by false pretenses—Luppino literally obtained this money by the conduct constituting false pretenses, namely, the commercial bribery scheme. The same cannot be said for the salary and other emoluments paid to Luppino during the period 1984 through October 1990. Luppino obtained his salary and benefits by performing his duties as an employee of Ciba–Geigy—he did not obtain his salary and benefits by his acts relating to kickbacks, any more than he obtained his salary and benefits by engaging in the alleged sexual harassment for which he was fired in October 1990. Stated differently, Luppino's salary was not a damage or harm suffered by Ciba–Geigy caused by the commercial bribery—it was the agreed recompense for his job.

 The analysis under Section 523(a)(2)(A) must focus on each debt which is sought to be held non-dischargeable, and each must pass the test of being "a debt ... for obtaining money ... to the extent obtained by ... false pretenses." Simply stated, the salary and other benefits were in no sense obtained by the false pretenses here involved (*i.e.,* the commercial bribery scheme), and the fact that New York law and a New York court granted Ciba–Geigy a cause of action to recover Luppino's salary and benefits does not mean that this part of the judgment debt passes muster under the express language of the statute limiting the causal relationship between the debt and the false pretenses.

Accordingly, Novartis' claim under Section $523(a)(2)(A) based on the $803,301.78 portion of the state court judgment based on breach of fiduciary duty of loyalty is denied.

Counsel for the parties are directed to confer together and jointly submit an order disposing of this adversary proceeding consistent with this decision, without prejudice to the right of either party to appeal.