**PHILIP MORRIS, INCORPORATED,**
**Plaintiff,**

v.

**GRINNELL LITHOGRAPHIC CO., INC., Oliver Munson and Les Sutorius, Defendants.**

**No. 95–CV–0733 DRH.**

United States District Court,
E.D. New York.

Sept. 28, 1999.

Morvillo, Abramowitz, Grand, Iason & Silberberg, P.C., New York City, by Edward M. Spiro, for plaintiff.

Joseph W. Ryan, Jr., Uniondale, New York, for Grinnell Lithographic Co., Inc., and Oliver Munson, defendants.

David J. Sutton, Garden City, New York, for Les Sutorius, defendant.

*MEMORANDUM AND ORDER*

HURLEY, District Judge.

By notice of motion dated January 15, 1999, defendants Grinnell Lithographic Co., Inc. ("Grinnell") and Oliver Munson ("Munson"), seek the following relief:

1. an order pursuant to Rule 56 of the Federal Rules of Civil Procedure:

(a) dismissing all claims of Philip Morris, Incorporated ("plaintiff") for failure to prove that it suffered an injury as a result of defendants' conduct, or, alternatively;

(b) dismissing plaintiff's treble damages claim under Section 2(c) of the Robinson–Patman Act, 15 U.S.C. § 13(c) (" § 2(c)"), given the absence of proof of "antitrust injury" as required by Section 4 of the Clayton Act, 15 U.S.C. § 15 (" § 4");

(c) dismissing plaintiff's claim under Section 180.03 of the New York State Penal Law (" § 180.03") on the ground that the statute does not create a private cause of action; and

(d)· dismissing plaintiff's claims against Munson on the ground there is no evidence to indicate his authorization or awareness of payments made by Les Sutorius ("Sutorius") to Louis Cappelli ("Cappelli").

2. an order, pursuant to Federal Rules of Evidence 104, 401, 403 and/or 702, declaring the report of plaintiff's expert (the "Rapp Report") to be inadmissible as "irrelevant and unreliable"; and

3. in the event plaintiff's federal claim—*i.e.*, the purported violation of the Robinson–Patman Act—is dismissed, declining to exercise supplemental jurisdiction over the state claims asserted.

As explained below, the relief sought in paragraphs 1(a)(b) and (d) above are denied; the relief sought in paragraph 1(c)—pertaining to the cause of action predicated on § 180.03—is granted; the relief sought in paragraph 2—pertaining to the Rapp Report—is granted to the extent a hearing will be held before me immediately prior to jury selection to determine whether the Rapp Report and corresponding testimony of its author passes muster under relevant provisions of the Federal Rules of Evidence, consistent with the holding in *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999); and the relief sought in paragraph 3 is denied as moot in view of the above determinations.

## BACKGROUND

The complaint in this action arises from a bribery scheme participated in by Cappelli, the former Graphics Purchasing Manager of plaintiff's Marketing Services Purchasing Department, and Grinnell, a vendor which provided lithographic printing services to plaintiff.

Munson was and is the President, Chair of the Board, and a shareholder of Grinnell. Sutorius was a salesperson for Grinnell. For more than ten years, Sutorius,

acting for Grinnell, made weekly bribe payments to Cappelli. The weekly sums began at $100 per week in or about 1979, increasing over time to $400 a week for the mid–1988 to 1990 period. In addition, Cappelli was provided with golf vacations, and other gratuities, by Grinnell during the 1980s.

It is alleged in the complaint that "in excess of $150,000 in illegal bribes, kickbacks and gratuities" were paid to Cappelli in return for his manipulating the purchasing process for lithographic printing services to favor Grinnell. (Amended Compl. ¶ 1.) During the time frame involved, plaintiff awarded Grinnell contracts in excess of $54 million. The resulting injury to plaintiff was that "it paid substantially inflated prices" for the services received. *Id.*

On February 21, 1995, plaintiff filed the present action, alleging a federal claim based on the Robinson–Patman Act, as well as state law claims for fraud, commercial bribery and breach of fiduciary duty.

Extensive pre-trial proceedings occurred thereafter, with the case being placed on the ready trial calendar on October 15, 1998. A week later, defendants successfully sought permission to file a belated summary judgment motion.

## DISCUSSION

### A. *Format*

The items of relief requested by defendants[1] shall be discussed *seriatim* consistent with the sequence set forth in the notice of motion, beginning with the multiple requests for summary judgment. Before doing so, however, the standards for determining a motion for summary judgment will be reviewed.

### B. *Standards for Summary Judgment*

A motion for summary judgment may be granted only when it is shown "that there

---

1. For the sake of simplicity, the *moving* defendants—Grinnell and Munson—will be referred to herein as the "defendants," although there is a third, and non-moving defendant, *viz.*, Sutorius.

is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 57 (2d Cir.1987).

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion" and identifying which materials "it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548; *see also Trebor Sportswear Co. v. The Ltd. Stores, Inc.*, 865 F.2d 506, 511 (2d Cir.1989). The substantive law governing the case will identify those facts that are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Once the moving party has come forward with support demonstrating that no genuine issue of material fact remains to be tried, including pleadings, depositions, interrogatory answers, and affidavits, the burden shifts to the non-moving party to provide similar support setting forth specific facts about which a genuine triable issue remains. *See* Fed.R.Civ.P. 56(e); *Anderson*, 477 U.S. at 250, 106 S.Ct. 2505; *Borthwick v. First Georgetown Sec., Inc.*, 892 F.2d 178, 181 (2d Cir.1989); *Donahue*, 834 F.2d at 57. The Court must resolve all ambiguities and draw all reasonable inferences in favor of the non-moving party. *See Donahue*, 834 F.2d at 57. Moreover, the Court's role on a motion for summary judgment "in short, is confined ... to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. Partnership*, 22 F.3d 1219, 1224 (2d Cir.1994); *see also Consarc Corp. v. Marine Midland Bank, N.A.*, 996 F.2d 568, 572 (2d Cir.1993).

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247–48, 106 S.Ct. 2505 (emphases omitted). Moreover, "[c]onclusory allegations will not suffice to create a genuine issue. There must be more than a 'scintilla of evidence,' and more than 'some metaphysical doubt as to the material facts.'" *Delaware & Hudson Ry. Co. v. Consolidated Rail Corp.*, 902 F.2d 174, 178 (2d Cir.1990) (quoting *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505, and *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)); *see also Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir.1991). "The non-movant cannot escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts, ... or defeat the motion through mere speculation or conjecture." *Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir.1990) (citations and internal quotations omitted).

### C. *Purported Absence of Proof of Injury*

Defendants' initial argument is that *all* of plaintiff's claims should be dismissed because it has not suffered any injury as a result of defendants' conduct.

Plaintiff intends to call Richard T. Rapp, Ph.D. ("Rapp"), an economist and president of an economics consulting firm, to testify as an expert that "Philip Morris paid an average of approximately 22 percent more for products when purchased from Grinnell than in comparable transactions from other vendors, resulting in approximately $11.5 million in damages to Philip Morris." (*See* Rapp Affidavit, sworn to Feb. 5, 1999 ("Rapp Aff."), at ¶ 3.) But, as noted, defendants have moved to preclude such testimony being offered at trial, and therefore, have asked the Court to focus solely on the "undisputed

factual (*i.e.*, non-expert) evidence" in deciding this issue. (*See* Defs.' Mem. at 20.)

■ Based on the submissions of counsel, it appears—as defendants assert—that neither Cappelli nor any other individual who provided information during the discovery phase of the case, was able to identify a specific transaction in which a product supplied by Grinnell could have been furnished to plaintiff by another vendor at a lower price. That circumstance, however, is not fatal to plaintiff's case. To the contrary—and not considering the proffered testimony of Rapp as requested by defendants—there is a legal presumption that, at a minimum, the prices paid by plaintiff to Grinnell were inflated by the amount of the bribes and, accordingly, the bribe amounts are recoverable as damages. *Grace v. E.J. Kozin Co.*, 538 F.2d 170, 173–74 (7th Cir.1976); *Continental Mgmt. Inc. v. United States*, 208 Ct.Cl. 501, 527 F.2d 613, 618 (1975) ("[I]t is enough to show the fact and amount of the bribes—nothing further need be alleged or proved by way of specific or direct injury."); *Novartis Corp. v. Luppino (In re Luppino)*, 221 B.R. 693, 703 n. 4 (Bankr. S.D.N.Y.1998); *see also Donemar, Inc. v. Molloy*, 252 N.Y. 360, 365, 169 N.E. 610 (1930); *City of New York v. Liberman*, 232 A.D.2d 42, 660 N.Y.S.2d 872, 875 (1st Dep't 1997).

In sum, there is a material issue of fact whether plaintiff sustained an injury as a result of the bribes paid to Cappelli even if the damages delineated by Rapp are culled from the discussion. That being the case, defendants' omnibus request for summary judgment is rejected, thereby necessitating a discussion of their alternative, more limited summary judgment applications. The first of these, seeking a dismissal of plaintiff's treble damages claim based on a violation of § 2(c) of the Robinson–Patman Act, is the subject of the next section of this Memorandum Opinion, section "D."

**D.** *Motion to Dismiss Robinson–Patman Act Claim for Purported Failure to Satisfy Antitrust Injury Requirement*

**(1)** *Commercial Bribery Falls Within the Ambit of § 2(c) of the Robinson–Patman Act*

■ Plaintiff's first cause of action is based on a charged violation of § 2(c) of the Robinson–Patman Act[2] which provides:

> Payment or acceptance of commission, brokerage, or other compensation
>
> It shall be unlawful for any person engaged in commerce, in the course of such commerce, to pay or grant, or to receive or accept, anything of value as a commission, brokerage, or other compensation, or any allowance or discount in lieu thereof, except for services rendered in connection with the sale or purchase of goods, wares, or merchandise, either to the other party to such transaction or to an agent, representative, or other intermediary therein where such intermediary is acting in fact for or in behalf, or is subject to the direct or indirect control, of any party to such transaction other than the person by whom such compensation is so granted or paid.

15 U.S.C. § 13(c).

Section 2(c) was enacted primarily to prevent large buyers from obtaining indirect price discrimination by demanding that the suppliers pay fees to bogus brokers, which fees would then be returned to the buyers. *Federal Trade Comm'n v. Henry Broch & Co.*, 363 U.S. 166, 174, 80 S.Ct. 1158, 4 L.Ed.2d 1124 (1960); *Hansel 'N Gretel Brand, Inc. v. Savitsky*, 94 CV 4027, 1997 WL 543088, at *7 (S.D.N.Y. Sept.3, 1997); *Roosevelt Savings Bank v. Eveready Maint. Supply Co.*, 85 CV 245, 1987 WL 30194, at *1 (E.D.N.Y. Dec.2, 1987). But it has also been construed "to

---

**2.** The Robinson–Patman Act amended the Clayton Act. As a result, § 2(c) is sometimes referred to as § 2(c) of the Clayton Act, and sometimes as § 2(c) of the Robinson–Patman Act. Here, it will be referred to as § 2(c) of the Robinson–Patman Act.

cover cases of commercial bribery involving a breach of a fiduciary duty by the buyer's agent," a situation akin to the one at bar. *Roosevelt Savings Bank,* 1987 WL 30194, at *1, and cases cited therein; *see also Hansel 'N Gretel,* 1997 WL 543088, at *7, and cases cited therein including *Broch,* 363 U.S. at 169 n. 6, 80 S.Ct. 1158.

### (2) *Defendants Have Violated § 2(c)*

For plaintiff's cause of action predicated on § 2(c) to survive defendants' motion for summary judgment, it must first appear that there is a factual basis to maintain that the conduct alleged constitutes "commercial bribery" within the purview of the statute. That requirement clearly has been satisfied here, nor do defendants contend otherwise for present purposes. Indeed, if plaintiff's proof regarding Grinnell's conduct parallels the allegations in the complaint, it would have been entitled to injunctive or declaratory relief if the conduct was ongoing, even in the absence of evidence of concomitant antitrust or competitive injury. *See, e.g., Federal Trade Comm'n v. Simplicity Pattern Co.,* 360 U.S. 55, 64–66, 79 S.Ct. 1005, 3 L.Ed.2d 1079 (1959); *The Grand Union Co. v. Federal Trade Comm'n,* 300 F.2d 92, 99 (2d Cir.1962); *Biddle Purch. Co. v. Federal Trade Comm'n,* 96 F.2d 687, 691 (2d Cir. 1938); *Federal Paper Board Co. v. Amata,* 693 F.Supp. 1376, 1385–86 (D.Conn.1988).

### (3) *Parties' Positions as to Whether Defendants' Violation of § 2(c), Standing Alone, is Sufficient to Support Plaintiff's Claim for Treble Damages Under its First Cause of Action*

Plaintiff, however, is not asking for declaratory or injunctive relief. Instead, it seeks treble damages under § 4.[3] As to that claim, is the violation of § 2(c) by Grinnell sufficient to defeat defendants' motion for summary judgment? What, if anything, beyond the violation of that Section is required to vest plaintiff with a private right of action to sue for damages under the Clayton Act?

In defendants' view, considerably more is required. Citing such cases as *Amata,* 693 F.Supp. 1376; *Hansel 'N Gretel,* 1997 WL 543088; *Miyano Machinery USA, Inc. v. Zonar,* 1993 WL 23758, *7 (N.D.Ill. Jan.29, 1993); *NL Industries, Inc. v. Gulf & Western Industries,* 650 F.Supp. 1115 (D.Kan.1986); and *Haff v. Jewelmont Corp.,* 594 F.Supp. 1468, 1471–79 (N.D.Cal. 1984), defendants make reference to § 4, and urge that a violation of § 2(c) must be supplemented by proof of "antitrust injury" to permit an award for damages. (Defs.' Mem. at 22.) And it is urged that plaintiff "*cannot prove* any set of facts sufficient to show that *it suffered as a competitor:* there is no evidence of collusion, no evidence that Grinnell interfered with other bids, and no evidence that Philip Morris was injured as against other cigarette manufacturers or other purchases of lithographic displays." (*Id.* at 27 (emphases added).) It should be noted from the above underscoring that defendants equate "antitrust injury" with "competitive injury."

Plaintiff begins its counter-argument by correctly noting that commercial bribery is included within the scope of § 2(c), (Pl.'s Mem. at 14), and then arguing that in order to curb that abuse, "courts have expanded the scope of standing under Section 2(c) to include plaintiffs who demonstrate injury in the form of overcharges attributable to commercial bribe payments . . . ." (*Id.* at 16.) Competitive injury, in plaintiff's view, is simply not an element of its cause of action for damages. In support of this position, the Court's attention is directed to *Grace v. E.J. Kozin Co.,* 538 F.2d 170, 173 (7th Cir.1976); *Edison Elec. Institute v. Henwood,* 832 F.Supp. 413, 418–19 (D.D.C.1993); *Roosevelt Savings Bank v. Eveready Maintenance Supply Co.,* No. 85 CV 245, 1987 WL 30194 (E.D.N.Y.1987); *Gregoris Motors v. Nissan Motor Corp.,* 630

---

**3.** The text of § 4 of the Clayton Act is provided *infra* at 133.

F.Supp. 902, 910 (E.D.N.Y.1986); and *Municipality of Anchorage v. Hitachi Cable, Ltd.*, 547 F.Supp. 633, 639–40 (D.Alaska 1982).

Plaintiff, like defendants, treats "antitrust injury" and "competitive injury" as synomonous. (*See, e.g.*, Pl.'s Mem. at 14 ("Defendants contend that Philip Morris must prove it suffered '*antitrust injury*' as a result of the commercial bribery—*i.e., competitive injury* attributable to something the antitrust laws were designed to prevent, *see J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 562, 101 S.Ct. 1923, 68 L.Ed.2d 442 (1981)—in order to prevail on its claim under Section 2(c) of the Robinson–Patman Act." (emphases added)).) But, as shall be discussed, *infra*, the terms "antitrust injury" and "competitive injury" are *not* interchangeable, or synonymous, for purposes of a private antitrust claim for treble damages based on a substantive violation of § 2(c).

### (4) *Unsettled State of Law re Elements of a Private Cause of Action for Treble Damages Based on a Violation of § 2(c)*

Neither the Supreme Court nor the Second Circuit has delineated the elements which a private litigant must establish to recover treble damages for a violation of § 2(c),[4] and decisions from district courts and other circuits reflect varied approaches to the issue, producing divergent, often unreconcilable results.

Indeed, some courts have held that § 2(c) is essentially a self-contained antitrust statute, the violation of which may properly serve as a predicate for a monetary award. *See Calnetics Corp. v. Volkswagen of Am. Inc.*, 532 F.2d 674, 696 (9th

Cir.1976) ("We hold that, if distributor is able on remand to prove that [defendants] indeed committed acts of commercial bribery in violation of § 2(c), then the [distributor] ought to be allowed any damages proximately caused by that violation."); *Roosevelt Savings*, 1987 WL 30194, at *1; *Gregoris Motors*, 630 F.Supp. at 910.

In *Roosevelt Savings*, the terms "antitrust injury" and "competitive injury" are used interchangeably. *See* 1987 WL 30194, at *2 ("[W]hether antitrust injury must be shown is a closer question.... A plain reading of § 2(c) ... convinces me that a § 2(c) claim need not include a showing of anticompetitive injury."). The court in *Gregoris Motors* speaks solely of "anticompetitive effect" and concludes, based on "plain language" of § 2(c), that such injury need not be proven by plaintiff. 630 F.Supp. at 910.

Cases such as *Calnetics Corp., Roosevelt Savings* and *Gregoris Motors* reflect a literal reading of § 2(c), absent any reference to the requirements of § 4.

Other courts have concluded that a violation of 2(c) is insufficient to warrant an award of damages, unless coupled with proof of competitive injury. *See Hansel 'N Gretel*, 1997 WL 543088, at *8–10; *Miyano*, 1993 WL 23758, at *7–8; *Amata*, 693 F.Supp. at 1386–87; *NL Industries*, 650 F.Supp. at 1123 ("The absence of competitive injury is fatal to an antitrust claim.").

And finally, there is a third school of judicial thought. Its proponents are of the view that a party seeking treble damages as a result of commercial bribery must only establish a violation of § 2(c) and an "antitrust injury," which injury need not include proof of competitive injury. *Edi-*

---

**4.** The issue, of course, is not whether an aggrieved party may recover damages as a result of a defendant's conduct, but instead whether such a recovery may be premised on the purported federal antitrust character of that conduct. *Cf. Calderone Enters. Corp. v. United Artists Theatre Circuit, Inc.*, 454 F.2d 1292, 1297 (2d Cir.1971) ("Our decision [dis-

missing plaintiff's claim for treble damages under § 4 of the Clayton Act] does not leave the plaintiff here without a remedy. Assuming plaintiff's claims to be meritorious, it is not precluded from recovering single damages from UATC in a state court suit for breach of terms of the lease....").

*son Elec. Inst. v. Henwood*, 832 F.Supp. 413, 418–19 (D.D.C.1993); *Municipality of Anchorage v. Hitachi Cable, Ltd.*, 547 F.Supp. 633 (D.Alaska 1982). *Cf. Fitch v. Kentucky–Tennessee Light and Power*, 136 F.2d 12, 16 (6th Cir.1943).

The differing positions urged by the present parties as to the elements of plaintiff's cause of action for treble damages—as well as the divergent results reached by courts grappling with the same issue in other cases—seem to be traceable to how the following threshold questions are answered:

(i) is "antitrust injury" an element of a cause of action aimed at recovering treble damages for a violation of § 2(c) ("Question 1"); and

(ii) if so, does plaintiff's obligation to establish "antitrust injury" necessarily require *proof* that defendants' conduct caused it competitive harm in the marketplace ("Question 2")?

These questions will be addressed *seriatim*.

(5) *"Antitrust Injury" Is an Element of Plaintiff's Cause of Action for Treble Damages (Question 1)*

█ Preliminarily, it should be noted that § 2(c) simply defines that certain conduct is illegal. To pursue a private claim for treble damages requires reference to § 4 which expressly creates the right.[5] *See, e.g., Genesco Inc. v. T. Kakiuchi and Co.*, 815 F.2d 840, 853 (2d Cir.1987) (§ 2(c) makes certain business practices " 'unlawful' .... while § 4 of the Clayton Act ... provides for an express private right of action for treble damages to any person injured in his business or property as a result of any antitrust violation."); *Amata*, 693 F.Supp. at 1386–88. *Cf. J. Truett Payne*, 451 U.S. at 561–62, 101 S.Ct. 1923 (discussing relationship between § 2(a)

and § 4 of the Clayton Act); *Brunswick Corp. v. Pueblo–O–Mat, Inc.*, 429 U.S. 477, 484–87, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977) (discussing relationship between § 7 and § 4 of the Act).

Section 4 of the Clayton Act provides:

Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

15 U.S.C. § 15(a).

Section 4, by its terms, authorizes damage awards to those private antitrust litigants which demonstrate injury to their "business or property," caused "by reason of" a violation of the antitrust laws.

Although the expansive language of § 4—particularly the phrase "by reason of"—would appear to authorize treble damages to any aggrieved party that was able to establish a nexus between an injury sustained and a defendant's violation of an antitrust law provision, the statute has not been so broadly construed. *Brunswick*, 429 U.S. at 489, 97 S.Ct. 690 ("[T]o recover treble damages ... [plaintiff] must prove *more* than injury causally linked to an illegal presence in the market." (emphasis added)); *Atlantic Richfield Co. v. USA Petro. Co.*, 495 U.S. 328, 334, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990); *Local Beauty v. Lamaur*, 787 F.2d 1197, 1200–01 (7th Cir.1986).

Indeed, § 4 has been judicially circumscribed to include only claims of "antitrust injury." That term has been defined by the Supreme Court to mean "actual injury

**5.** Plaintiff does not argue that § 4 is wholly irrelevant to its first cause of action. Indeed, it would be hard pressed to do so, since the sole statutory authority for the treble damages sought is found in that Section. But it vigorously contests defendants' claim that § 4 requires plaintiff to establish "antitrust injury," which, again, it incorrectly construes as requiring proof of "competitive injury."

attributable to something the antitrust laws were designed to prevent." *J. Truett Payne*, 451 U.S. at 557, 101 S.Ct. 1923. But—prescinding for the moment from the question of whether antitrust injury may exist absent proof of competitive injury— that limiting definition does not appear to be an impediment to plaintiff. The injury to its business—in an amount at least equal to the bribes paid—was the direct result of commercial bribery, an activity outlawed by § 2(c) thereby satisfying the *J. Truett Payne* definition. Moreover, the damage incurred clearly dovetails with the statutory language of § 4, that is, an injury caused "by reason of [something] forbidden in the antitrust laws."

In sum, antitrust injury is an element of a cause of action seeking treble damages, which plaintiff seemingly has met. Defendants note, however, that the complaint speaks solely of plaintiff having paid inflated sums for goods and services purchased from Grinnell, devoid of any suggestion that the increased prices affected its ability to function in the marketplace. Is that a fatal flaw in plaintiff's first cause of action? In other words, may antitrust injury be established by plaintiff without a showing of competitive injury?

(6) *Absence of Demonstrable Competitive Injury Does not Preclude Plaintiff From Recovering Treble Damages Based on Defendants' Violation of § 2(c) (Question 2)*

This subdivision of the opinion will be divided into two major parts for analytical purposes.

■ The first part consists of a review of a settled area of antitrust law, *viz.*, that Congress, in enacting the Robinson–Patman Act, determined, as recognized by the courts, that certain business practices—such as those covered by § 2(c)— are unlawful per se, while others—such as discriminatory pricing under § 2(a)—are not necessarily unlawful, *i.e.*, are non per se in character. The recognized difference between the two is that a per se unlawful practice under the Robinson–Patman Act is inherently anticompetitive, thus obviating the need to *prove* anticompetitive injury when the relief sought is injunctive or declaratory in nature; for a non per se practice, such injury is not implicit and, thus, more than the mere commission of the act must be shown in order to establish a substantive violation of the statute.

After reviewing that settled area of the law, and with the corresponding principles in mind, attention will be turned to the pivotal, and unsettled issue regarding plaintiff's first cause of action, that being whether its burden of proof in seeking treble damages under § 4 requires a showing that defendants' conduct caused competitive injury. Or, given the per se character of commercial bribery, may the required antitrust element of the § 4 claim be satisfied without such proof?

a) *Whether Competitive Injury Must be Shown to Establish a Substantive Violation of the Robinson–Patman Act Depends on the Antitrust Provision Involved.*

■ The Clayton Act, including the Robinson–Patman Act, the Sherman Act, and certain parts of a federal tariff act, constitute the federal antitrust laws. (1050 PLI/Corp. 811, 819 (1998), citing 15 U.S.C. § 12.) Their shared goal is to protect competition and, in the case of the Robinson–Patman Act, to protect competitors as well. *Chroma Lighting v. GTE Prods. Corp.*, 111 F.3d 653, 657–58 (9th Cir.1997); *Monahan's Marine, Inc. v. Boston Whaler*, 866 F.2d 525, 528 (1st Cir. 1989) ("Unlike the Sherman Act which protects 'competition, not competitors,' *Brown Shoe Co. v. United States*, 370 U.S. 294, 320, 82 S.Ct. 1502, 8 L.Ed.2d 510 ... (1962), the Robinson–Patman Act extends its protection to competitors.") From that, however, it may not be inferred that *proof* of an effect on competition, or competitive injury, is a *sine qua non* to a charged Robinson–Patman Act violation.

Such may, or may not be the case depending on the statutory provision involved.

As to a substantive violation of the Robinson–Patman Act—as distinct from a concomitant private claim for damages under § 4, which will be discussed shortly—the Supreme Court underscored the above point in *F.T.C. v. Simplicity Pattern Co.*, thusly:

> Section 2(a) makes unlawful price discriminations 'where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition. . . .'

> This price discrimination provision is hedged with qualifications. An exception is made for price differentials 'which make only due allowance for differences in the cost of manufacture, sale, or delivery.' Care was taken that price changes are not outlawed where made in response to changing market conditions. Finally, § 2(a) codifies the rule of *United States v. Colgate & Co.*, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919), protecting the right of a person in commerce to select his 'own customers in bona fide transactions and not in restraint of trade.'

> Subsections (c), (d), and (e), on the other hand, unqualifiedly make unlawful certain business practices other than price discriminations.

> *In terms, the proscriptions of these three subsections are absolute. Unlike § 2(a), none of them requires, as proof of a prima facie violation, a showing that the illicit practice has had an injurious or destructive effect on competition.*

360 U.S. 55, 64–65, 79 S.Ct. 1005, 3 L.Ed.2d 1079 (emphasis added).

In *Simplicity,* the Supreme Court reversed a circuit decision which had set aside a cease and desist order issued by the Federal Trade Commission. That cease and desist order, based on a violation of § 2(e),[6] prohibited Simplicity Pattern from continuing its practice of providing services and facilities to its larger customers which were not afforded to competing smaller customers on a proportionally equal basis.

Given that Congress has concluded that § 2(e), along with § 2(c) and § 2(d) involve per se violations, (*i.e.*, "the proscriptions of these three subsections are absolute"; *id.*), the Court held that neither the absence of proven competitive injury nor the presence of cost justification was relevant to the charged violation. In other words, if the act was committed, the substantive violation occurred.

With respect to per se violations of the Robinson–Patman Act, it is not that the targeted practices do not effect competition. Were that the case, the antitrust laws would not be implicated. Instead, Congress decided that such practices are necessarily anticompetitive and, thus, no proof to that effect is required to establish a violation. *See, e.g., Grand Union,* 300 F.2d at 99 ("[I]n making same, but not all, of the practices outlawed by the Robinson–Patman Act illegal per se, Congress indicated that those selected for per se treatment *always led to the undesired effects in competition.*" (emphasis added)); *Fitch v. Kentucky–Tennessee Light & Power,* 136 F.2d 12, 16 (6th Cir.1943) ("Plainly, the payment of the secret commissions to Fitch was an unfair labor practice, and obviously resulted in lessening competition in the sale of coal to the Power Company."). *Cf. Simplicity,* 360 U.S. at 63 n. 5, 79 S.Ct. 1005 ("Simplicity argues that the

---

**6.** Section 2(e) of the Robinson–Patman Act provides that "[i]t shall be unlawful for any person to discriminate in favor of one purchaser against another purchaser or purchasers of a commodity bought for resale, with or without processing, by contracting to furnish or furnishing, or by contributing to the furnishing of, any services or facilities connected with the processing, handling, sale, or offering for sale of such commodity so purchased upon terms not accorded to all purchasers on proportionally equal terms."

Examiner 'affirmatively found an absence of competitive injury.' This view was apparently adopted by the Court of Appeals.... We do not so read the record, however. What the Examiner said was that 'there is no *showing* of competitive injury' (emphasis added).").

In sum, it is well established that certain practices are per se unlawful under the Robinson–Patman Act as inherently anticompetitive, while others are not. Commercial bribery falls within the former category.

### b) *Plaintiff's Proof of Antitrust Injury Under § 4 Need Not Include Proof of Competitive Injury.*

 Does the distinction between per se and non per se violations of the Robinson–Patman Act carry over to corresponding damage claims under § 4 to the extent an aggrieved party who has established (1) a substantive violation of § 2(c) and (2) "antitrust injury" need not also *prove* anticompetitive effect?

Plaintiff, as discussed previously, has framed the issue under discussion somewhat differently than above. But in urging that competitive injury is not an element of its cause of action for treble damages, considerable stock has been placed in *Roosevelt Savings Bank v. Eveready Maintenance Supply Co.*, and *Gregoris Motors v. Nissan Motor Corp.*, the two decisions from this district addressing that question. Both concluded that such proof is not required for the victim of commercial bribery to recover damages. Although I agree with the results reached in both *Roosevelt Savings Bank* and *Gregoris Motors*, defendants are correct in noting that the analytical process in each of those cases is perhaps overly cryptic in that no reference is made to § 4, nor to the requirement—as explained in *J. Truett Payne*—that one seeking treble · damages must establish antitrust injury. *See also Edison Elec. Inst. v. Henwood*, 832 F.Supp. 413, 418 (D.D.C.1993) (court relied on per se ille-

gality of commercial bribery in concluding that competitive injury need not be established; however, like *Roosevelt Savings* and *Gregoris Motors*, no mention is made of § 4).

However, among the many other decisions cited by plaintiff in support of its position, I found *Municipality of Anchorage*, 547 F.Supp. at 640, to be particularly helpful for present purposes. *Fitch*, 136 F.2d 12, also warrants brief mention.

In *Municipality of Anchorage*, the municipality brought an action under, *inter alia*, § 2(c) for damages caused by defendants' bribery of two municipal employees in a bid-rigging scheme.

Defendant Hitachi sought the dismissal of the § 2(c) claim, arguing along the following lines as synopsized by the district court:

> [T]he Municipality lacks standing to sue. Hitachi suggests that when a seller bribes a buyer's agent, only competitors of the seller suffer competitive injury and have standing to sue. Furthermore, since the Utility is a regulated monopoly and has no competitors, it cannot suffer a competitive injury.

547 F.Supp. at 637.

After recognizing the unsettled state of the law as to whether proof of an adverse effect on competition is necessary to establish liability under § 2(c) and § 4, the district court found that it was not, reasoning:

> Any examination of a plaintiff's right to sue under a statute must begin with the language of the statute itself. I find nothing in the language of section 2(c) to justify imposing a competitive injury requirement on potential plaintiffs. Unlike section 2(a) which outlaws price discrimination whose effect 'may be substantially to lessen competition or tend to create a monopoly', sections 2(c), (d), and (e) prohibit business practices other than price discrimination. *F.T.C. v. Simplicity Pattern Co.*, 360 U.S. 55, 65, 79 S.Ct. 1005, 1011, 3 L.Ed.2d 1079 (1959). None of these latter sections

"requires, as proof of a prima facie violation, a showing that the illicit practice has had an injurious or destructive effect on competition." *Id.*

. . . . .

Suits for damages by private plaintiffs "injured in ... business or property" are authorized by section 4 of the Clayton Act, 15 U.S.C. § 15.... Section 4 has long been read to include a requirement that any potential plaintiff under the antitrust laws be within the so-called 'target area' of the antitrust violations.... Although the exact boundaries of the target area may be the subject of much dispute, the purpose of this requirement is to limit recovery under antitrust law to those entities whom the laws were meant to protect. *[Blue Shield of Virginia v.] McCready,* 457 U.S. 465, 102 S.Ct. [2540], 2548 [1982], [73 L.Ed.2d 149]; *Brunswick Corporation v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977).

. . . . .

I conclude that, when commercial bribes are paid to a company's employees to obtain contracts for the sale of goods, the company has standing to bring an action for damages under section 2(c) of the Robinson–Patman Act. 15 U.S.C. § 13(c).... I reject the analysis [in those decisions which have reached a contrary result], believing that those cases adopt too narrow a view of the intent and purpose of section 2(c).

*Id.* at 639–40.

*Anchorage* is instructive for, *inter alia,* its focus on the statutory language of § 2(c) and that section's per se character, as well as its explanation of the standing requirements for a § 4 claim which dovetails nicely with the definition of "antitrust injury" given in *J. Truett Payne.*

In *Fitch,* the utility's former president, Fitch, accepted bribes in return for awarding purchase contracts to the Nashville Coal Company. As a result, he, the coal company and its president were sued by the utility, which obtained a judgment for treble damages against defendants based on violations of § 2(c).

On appeal, appellant argued that § 2(c) "is concerned only with price discriminations extended by sellers to different buyers; and that there is no proof that the seller in this case so discriminated." 136 F.2d at 15.

*Fitch* predates the decisions which articulated the dichotomy between the primary purpose for enacting § 2(c) (*i.e.,* to curtail price discrimination accomplished through sham brokers) and the additional goal of curbing commercial bribery in the purchase or sale of goods. Thus, in rejecting appellant's argument that the subject conduct was beyond the ambit of § 2(c), the Court did not employ the later developed term of "commercial bribery." Yet, *Fitch* —in affirming the treble damages award to the victimized utility—is significant for present purposes in that it speaks of "secret commissions" being an "unfair trade practice [which] obviously result[s] in lessening competition." *Id.* at 16.

Plaintiff, at least as to the result urged, I believe has the better side of the argument. Commercial bribery by its very nature is anticompetitive. Indeed, the sole purpose of the practice is to circumvent competitive forces in obtaining a contract. Congress, as explained by the Supreme Court in *Simplicity,* recognized that fact in drafting § 2(c). While price discrimination may, or may not be violative of § 2(a), commercial bribery is always violative of § 2(c) and is never in the public interest.

There is no reason that the per se character of such conduct should not be recognized in private suits for damages under § 4. To the contrary, such private suits will serve to curtail such purely pernicious business practices in the marketplace, consistent with the purpose of § 4 as tellingly explained by the Supreme Court in *Blue Shield of Virginia v. McCready:*

[T]he lack of restrictive language [in the treble damages provision of § 4] reflects Congress' 'expansive remedial purpose' in enacting § 4: Congress sought to create a private enforcement mechanism that would deter violators and deprive them of the fruits of their illegal actions, and would provide ample compensation to the victims of antitrust violations.

457 U.S. 465, 472, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982) (citations omitted); *see also Calderone Enters.*, 454 F.2d at 1295.

In sum, plaintiff was a victim of a violation of § 2(c) on the undisputed facts, and sustained an injury consistent with *both* the statutory requirements of § 4 as written by Congress and the definition of "antitrust injury" set forth in *J. Truett Payne.* Antitrust injury need not entail proof of competitive injury, given that commercial bribery under § 2(c) is the type of per se violation which presupposes an anticompetitive effect.[7]

In reaching this conclusion, I declined to follow such cases as *Hansel 'N Gretel,* 1997 WL 543088, *Amata,* 693 F.Supp. 1376, and *NL Industries,* 650 F.Supp. 1115, which hold that the absence of proof of competitive injury is fatal to a cause of action for treble damages. Common to those three decisions—all of which are relied upon by defendants—is what I perceive to be a failure to draw the critical distinction between non per se antitrust violations, and per se Robinson–Patman Act violations, for purposes of private damages claims under § 4.

By way of example, consider *Hansel 'N Gretel.* There, Savitsky, while an officer of Hansel 'N Gretel, conducted a kickback scheme whereby various suppliers over-

charged the company and divided the excess with him. 1997 WL 543088, at *1. The company sued for, *inter alia,* treble damages under §§ 2(c) and 4 of the Clayton Act, naming Savitsky, and two participating suppliers as defendants.

Defendants moved to dismiss the company's Robinson–Patman Act cause of action on the ground that it failed to allege "competitive injury." The district court accepted that argument,[8] based on the following rationale:

When a § 2(a) claim is brought by a buyer who has allegedly been discriminated against directly by the seller, it "must first prove that, as the disfavored purchaser, it was engaged in actual competition with the favored purchaser(s) at the time of the price differential." . . . Although the present case concerns § 2(c), the same principle must apply. Absent such discrimination against parties engaged in actual competition, I discern no anticompetitive effect arising out of the kickbacks at issue which harmed plaintiff.

*Id.* at *10.

The relevant excerpt from *Amata* reads:

To recover damages under section 4, the Court [in *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977) ] held that the petitioner had to do more than prove that the defendant violated section 7. . . . In addition to proving a violation of the substantive antitrust law, "[p]laintiffs must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants'

---

7. While commercial bribery under § 2(c) of the Robinson–Patman Act is, by its very nature and purpose, anticompetitive, the same may not be said of all per se antitrust violations. *See Atlantic Richfield Co. v. USA Petro.,* 495 U.S. 328, 342, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990) ("Actions per se unlawful under the antitrust laws [such as low prices produced by non predatory price fixing in violation of § 1 of the Sherman Antitrust Act]

may nonetheless have some procompetitive effects.")

8. Parenthetically, although the district court in *Hansel 'N Gretel Brand Inc. v. Savitsky,* 1997 WL 543088, adopted the position that antitrust injury required proof of anticompetitive harm to permit damages under § 4 for a violation of § 2(c), it found that plaintiff's complaint satisfied that standard. *Id.* at *10.

acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." . . .

The *Brunswick* analysis has been applied to violations of the Robinson–Patman Act, and it governs Federal's claim for treble damages. In *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 101 S.Ct. 1923, 68 L.Ed.2d 442 (1981), the petitioner alleged a violation of section 2(a) of the Robinson–Patman Act. In its analysis of the petitioner's claim, the Court noted that "[o]ur decision here is virtually governed by our reasoning in [*Brunswick* ]." *Id.* at 562, 101 S.Ct. at 1927. The petitioner had to prove more than just a violation of section 2(a), "since such proof establishes only that injury may result." *Id.* (quoting *Brunswick*, 429 U.S. at 486, 97 S.Ct. at 696). "To recover treble damages . . . a plaintiff must make some showing of actual injury attributable to something the antitrust laws were designed to prevent." *Id.* . . . . Although *J. Truett Payne* involved section 2(a) of the Robinson–Patman Act, there is no reason why its analysis should not also apply to claims arising out of section 2(c) since in both instances the right to treble damages is granted by section 4 of the Clayton Act.

693 F.Supp. at 1387–88.

And finally, the district court in *NL Industries* held that a private antitrust claim for damages based on a violation of § 2(c) is not viable in the absence of competitive injury, citing *Brunswick Corp. v. Pueblo Bowl–O–Mat*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). 650 F.Supp. at 1123. But *Brunswick* involved a violation of § 7 of the Clayton Act. That section proscribes mergers whose effect *"may* be substantially to lessen competition . . . ." 15 U.S.C. § 18 (emphasis added). Obviously, given the statutory language involved, a private litigant may not rely simply on a violation of § 7 in seeking damages under § 4. Instead, such a party must prove actual as distinct from potential harm, which harm must pertain to competition, again, given the language of § 7. And to have standing under § 4, or "antitrust injury" as explained in *J. Truett Payne*, the competitive harm must have been to that party.

In sum, *Hansel 'N Gretel* relied in large measure on § 2(a) decisions to decide a § 2(c) case; *Amata* used both § 2(a) and § 7 decisions, while *NL Industries* relied on *Brunswick*, a § 7 case, for the same purpose, *i.e.*, to decide a § 2(c) case.

For the reasons given, the holdings in antitrust cases involving non per se violations are not interchangeable with those involving per se unlawful business practices under the Robinson–Patman Act, such as commercial bribery under § 2(c). That statement is beyond cavil for substantive violations. Based on the statutory language of § 2(c) and § (4), the purpose sought to be advanced by each of the statutes, and what I believe to be the better reasoned cases, (particularly *Municipality of Anchorage* ), I conclude that the per se character of § 2(c) violations is equally applicable to claims under § 4 in the sense that an aggrieved party—while required to establish both a substantive violation and an antitrust injury—is not obligated to also *prove* that such injury caused competitive harm.

I have also reviewed the other cases cited by defendants and find them unpersuasive as well.

For the reasons indicated above, defendants' motion for summary judgment on plaintiff's first cause of action is denied.

E. *Private Right of Action Under Penal Law § 180.03*

■ Plaintiff's second claim against defendants is for commercial bribery in violation of Penal Law § 180.03. (*See* Compl. ¶¶ 37–40.) Plaintiff asserts that by defendants' violation of the Penal Law, it "has been injured in its business" and its damages include "the payment of inflated

prices for goods and services." (*See id.* ¶ 39.) Plaintiff further contends that by virtue of the willful conduct of defendants, punitive damages should be awarded. (*Id.* ¶ 40.) Defendants, however, contend that plaintiff's second claim should be dismissed because "there is no private right of action for a violation of section 180.03 of the penal code." (Defs.' Mem. at 33.)

Section 180.03 of the New York State Penal Law provides:

> A person is guilty of commercial bribing in the first degree when he confers, or offers or agrees to confer, any benefit upon any employee, agent or fiduciary without the consent of the latter's employer or principal, with intent to influence his conduct in relation to his employer's or principal's affairs . . .

N.Y. Penal Law § 180.03. As a threshold matter, the Court notes that the statute does not itself create a private right of action. As Judge McKenna explained in *Philip Morris, Inc. v. Heinrich,* No. 95 CIV. 0328, 1996 WL 363156, at *18 (S.D.N.Y. June 25, 1996), that does not end the inquiry; "[a]bsent such a directive, the courts are to determine themselves, considering such factors as legislative history, consistency with the overall legislative scheme for creating the private right and whether the plaintiff is one of the class for whose special benefit the statute was enacted." *Id.* The court in *Philip Morris* concluded that it was unnecessary to create a private right of action under the Penal Law as recovery could be had under common law theories of fraud and breach of fiduciary duty for such conduct. *Id.* at *17.

It appears that every federal court considering the issue has concluded that the commercial bribery sections of the Penal Law do not create a private right of action. *See, e.g., id.* at *18 (declining to find private right of action under Penal Law § 180.03 (citing *Kinley Corp. v. Integrated Resources Equity Corp. (In re Integrated Resources, Inc.),* 851 F.Supp. 556, 563 (S.D.N.Y.1994) (holding that there is no private right of action under Texas commercial bribery statute))); *Sierra Rutile Ltd. v. Katz,* No. 90 Civ. 4913, 1996 WL 556963, at *4 (S.D.N.Y., Oct. 1, 1996) (no private right of action under Penal Law § 180.08); *Texwood Ltd. v. Gerber,* 621 F.Supp. 585, 589 (S.D.N.Y.1985) (noting that plaintiffs cited no authority for the proposition that a private right of action exists under Penal Law § 180.03, but explaining that under New York law an employer may recover from his employee bribes taken in violation of § 180.08 and limiting plaintiffs' recovery to the amount of the bribes).[9]

Aside from the case law distinguished by Judge McKenna in *Philip Morris* and a more recent case, *City of New York v. Liberman,* 232 A.D.2d 42, 660 N.Y.S.2d 872 (1st Dep't 1997), plaintiff cites no authority to support its view that a private cause of action under the Penal Law exists. *Liberman,* moreover, does not compel the conclusion urged by plaintiff. Indeed, *Liberman* is not applicable because the claim pursued by plaintiff in that case was not based upon the commercial bribery section of the New York Penal Law. Rather, the Court in *Liberman* simply held that the purchaser was entitled to recover any bribe monies paid by a vendor to its agent.[10] That holding dovetails with

---

9. In *Benedict v. Amaducci,* 92 Civ. 5239, 1995 WL 702444, at *8 (S.D.N.Y., Nov.28, 1995), cited by plaintiff, the court held that because the complaint failed to allege that benefits were conferred without the consent of the employer, the complaint did not properly allege commercial bribery under Penal Law § 180.03 as a RICO predicate act. The court did not address whether a private right of action under Penal Law § 180.03 existed.

10. Also, as the bribery in *Liberman* involved a public official, the Court explained that a more stringent rule should be applied. *See* 232 A.D.2d at 49, 660 N.Y.S.2d 872. Specifically, "[v]endors that corrupt public officials forfeit their right to all payments due under the tainted transaction." *Id.* The *Liberman* Court noted that, while the plaintiff did not seek such relief there, "the policy . . . that those who engage in corrupt acts with public

the well-settled principle of New York law that an employer whose agent has received commercial bribes is entitled to recovery of such bribes. *See, e.g., Donemar v. Molloy,* 252 N.Y. 360, 365, 169 N.E. 610 (1930) ("If ... a vendor bribes purchaser's agent, it must be assumed that the purchase money is loaded by the amount of the bribe. The vendor has had and received money which belongs to the purchaser to the extent of the bribe, which neither the vendor nor the unfaithful agent may in good conscience and good morals retain."); *British American & E. Co. v. Wirth Ltd.,* 592 F.2d 75, 79 (2d Cir.1979) ("[W]here there is an agency relationship, the principal is entitled to recover any monies paid as commercial bribes to his agent."); *Sierra,* 1996 WL 556963, at *4 (same).[11]

Based on the foregoing, the Court agrees with the other federal courts that have refused to recognize a private right of action based on a violation of New York Penal Law § 180.03. Accordingly, plaintiff's second claim is dismissed.

## F. *Defendants' Motion to Dismiss all of Plaintiff's Claims Against Defendant Oliver Munson Is Denied*

■ It should be noted that Munson was during the time frame alleged in the complaint, and apparently still is, the President, Chair of the Board, and a shareholder of Grinnell. Now that discovery has been completed, defendants' counsel moves to dismiss all claims against Munson on the ground that there is no proof that he either authorized or was aware of the bribes Sutorius paid to plaintiff's purchasing agent Cappelli.

Although the bulk of the bribes to Cappelli consisted of weekly cash payments (*see* "Stipulated Facts," Ex. A to Not. of Mot., at 9), the bribes also were furnished in other forms. By way of example, plaintiff alleges in its complaint that, as part of the "Bribery Scheme," "Grinnell, Munson and Sutorius also arranged for or paid for Cappelli's golf vacations on at least four occasions...." (Am.Compl. "The Bribery Scheme" ¶ 23 at 7.) That such "all expenses paid" golf vacations were provided to Cappelli, with the "knowledge and consent of Munson," is conceded in the stipulation of facts entered into between plaintiff and defendants. (Stipulation of Facts, Ex. A to Not. of Mot., ¶ 22 at 10.) Conceivably, defendants will posit that the free golf vacations at distant locales were not bribes, contrary to the position taken by plaintiff in its complaint and now. However, at the very least, the present scenario raises a material issue of fact which precludes defendants' request for summary judgment as to the claims asserted against Munson. Whether Munson may also be held accountable for other bribes paid to Cappelli based on, *e.g.,* his review of the expense reports of Sutorius which were inflated by the bribe payments, need not be addressed in view of the foregoing.

In sum, for the reasons indicated, defendants' motion to dismiss all claims against defendant Munson is denied.

## G. *Defendants' Application to Preclude the Admission Into Evidence of the Rapp Report as Being Irrelevant and Unreliable Is Granted to the Extent That a Hearing Will be Held Prior to Trial*

Rapp was retained by plaintiff to testify as an expert regarding the damages it sustained as a result of defendants' commercial bribery. In performing his analysis, Rapp examined "4,067 product contracts set forth on purchase orders prepared and issued by Philip Morris for

---

officials are subject to serious civil consequences, provides an independent basis for the awarding, at an absolute minimum, of· damages equal to the amount of the bribe." *See id.*

**11.** Defendants do not take issue with plaintiff's argument that it should recover the amount of the bribes; in fact, defendants have offered a tender of judgment in that amount, pursuant to Federal Rule of Civil Procedure 68. (*See* Defs.' Reply Mem. at 24.)

lithographic products of the type Grinnell supplied from 1979 to 1991." (Rapp Aff. ¶ 13.) Utilizing that data, he created "268 product categories, each containing products of a similar nature." *Id.* The purpose of this process was to "standardize" the various non-Grinnell and Grinnell products involved by endeavoring to account for numerous factors which could produce price differentials other than preferential treatment afforded to Grinnell. At the conclusion of this highly detailed undertaking, Rapp opined that plaintiff paid approximately 22% more for products it purchased from Grinnell than for similar products purchased from other vendors, resulting in a damage estimate of $11.5 million. (*Id.* at ¶ 6.)

Following Grinnell's receipt of the Rapp Report, it hired G. Hossein Borhani, Ph.D. ("Borhani"). Borhani focused on the obvious linch pin of the Rapp Report, to wit, the determination as to which non-Grinnell products were sufficiently similar to the products purchased from Grinnell to permit meaningful comparisons. (*See* Mar. 17, 1998 Borhani Report at 3.) Upon analyzing the Rapp Report, Borhani identified two purported problems:

1. Product category or codes so narrowly defined that many Grinnell products have been assigned a product code for which there are no corresponding products supplied by other vendors; and

2. That even when products are supplied by both Grinnell and other vendors, Rapp's methodology fails to appropriately account for a number of factors—such as, *e.g.*, number of colors in the lithographic materials supplied—which may affect the contract price. (*See id.* at 5–6.)

The Rapp Report, viewed in isolation, suggests that its introduction would be of assistance to the jury in determining plaintiff's damages, and that the methodology employed is sufficiently reliable to warrant its introduction consistent with my "gatekeeper" role under Rule 104(a) and *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 119

S.Ct. 1167, 143 L.Ed.2d 238 (1999). But, of course, the Rapp Report may not be reviewed in isolation. Rather the comments of Borhani must be taken into account. Those comments go directly to the reliability of the methodology employed.

Under the circumstances, a hearing will be scheduled immediately prior to trial to provide me with an opportunity to hear Rapp's and Borhani's testimony concerning their respective positions and the factual predicates for those positions, subject to questioning by the Court and to cross-examination by opposing counsel.

### CONCLUSION

The relief sought by defendants in the motion are denied except (1) plaintiff's claim under § 180.03 of the New York State Penal Law is dismissed and (2) defendants' application to preclude Rapp's testimony and the Rapp Report is granted to the extent that a hearing will be held immediately prior to jury selection to determine their admissibility.

SO ORDERED.